# Exhibit A

Ben Higgins:  Okay, good afternoon.  Let the record reflect that today is February 2nd, 2018.  Happy Groundhog Day.  The time is 2:30 P.M.  This is the meeting of creditors in the chapter 11 case of the [INDISCERNIBLE 00:00:18] Level Solar Incorporated, case number 1713469NKV.  My name is Ben Higgins. I'm an attorney in the Office of the United States Trusty.  That's a compartment of the Department of Justice.  And I will be the presiding officer at this meeting.  Pursuant to the bankruptcy code, the United States trustee supervises the administration of bankruptcy cases.  The debtor is required to appear to be examined under oath regarding the bankruptcy case. The examination will be recorded, is being recorded, so, if you are questioning the debtor, I ask that you come up at that time and sit next to the recorder, and anyone questioning the debtor should state their names and indicate who they represent.  At this time I would like to swear in the debtor's representatives.  So, Mr. Pell, could you please raise your right hand?  Do you swear or affirm to tell the truth, the whole truth, and nothing but the truth?

Richard Pell:  I do.

Ben Higgins:  Okay, thank you.  Would you please state and spell your name?

Richard Pell:  Richard Pell.  It's R-I-C-H-A-R-D, middle initial C, last name Pell, P-E-L-L.

Ben Higgins:  And what is your relationship to the debtor?

Richard Pell:  Well, basically I was an investor in the company.  My wife and I both provided equity capital to the company, also revolving credit and other debt in the form of convertible notes.

Ben Higgins:  Okay.  Do you have any—go ahead.

1  Michael Conway:  Currently he's director and secretary.

2  Ben Higgins:  That was my question.  Director and secretary.  Any other

3  titles that you currently hold with the debtor?

4  Richard Pell:  No.

5  Ben Higgins:  Okay.  And are you personally familiar with the financial

6  affairs of the debtor?

7  Richard Pell:  Yes.

8  Ben Higgins:  Okay.  And will counsel please identify yourself for the

9  record?

10  Michael Conway:  Michael Conway, Shipman & Goodwin representing the debtor.

11  Ben Higgins:  Thank you.  Mr. Pell, I'm going to assume that you understand

12  the questions that I ask, unless you tell me that you don't understand them.

13  Is that okay?  Is there anything that would prevent you from thinking clearly

14  or testifying truthfully today?

15  Richard Pell:  No.

16  Ben Higgins:  Okay.  I'm going to turn your attention to the documents.  You

17  probably have a copy.  Okay.  So, first, can you take a look at the

18  bankruptcy petition in front of you?  Is that your signature on page 4?

19  Richard Pell:  Yes, it is.

20  Ben Higgins:  Okay.  And are you personally familiar with the information

21  contained in the bankruptcy petition?

22  Richard Pell:  Yes.

23  Ben Higgins:  Okay.  And what's in front of you appears to be a true and

24  accurate copy of the petition that was filed in this case?

25  Richard Pell:  Correct, yes.

```
 1  Ben Higgins:  Okay.  Would you take a look at the schedules?  Does that

 2  appear to be a true and accurate copy of the schedules that have been filed

 3  in this case?

 4  Richard Pell:  Yes.

 5  Ben Higgins:  Could you turn to the last page?  This is at—for the record,

 6  this is ECF docket number 35, page 46 of 46.  Is that your signature?

 7  Richard Pell:  Yes, it is.

 8  Ben Higgins:  Okay.  And are you personally familiar with the information

 9  contained in the schedules?

10  Richard Pell:  Yes.

11  Ben Higgins:  Okay.  And I'm going to ask you to take a look at the statement

12  of financial affairs.  It's ECF docket number 36.

13  Richard Pell:  Just a second.

14  Ben Higgins:  I think there's a copy of it here too if you can't find it

15  there.

16  Richard Pell:  I didn't see it there.

17  Ben Higgins:  It's I believe this after the first page here.

18  Richard Pell:  It's a list of creditors.

19  Ben Higgins:  Okay.  Can you turn to page 18, the last page, ECF page number

20  19 of 19?  Is that your signature on that page?

21  Richard Pell:  Yes, it is.

22  Ben Higgins:  And are you personally familiar with the information contained

23  in this statement?

24  Richard Pell:  Yes.

25
```

1  Ben Higgins:  Okay.  With respect to all three of the documents we just

2  discussed, did you review these documents before they were filed?

3  Richard Pell:  Yes.

4  Ben Higgins:  And is the information contained in these documents true,

5  correct, and complete to the best of your knowledge?

6  Richard Pell:  To the best of my knowledge.

7  Ben Higgins:  Okay.  Are there any changes that you would wish to make to any

8  of the documents at this time?

9  Richard Pell:  Did you make that one change to my wife's—?

10 Michael Conway:  No, there might be change to one of the creditors but

11 nothing to the substantial portions of the document.

12 Ben Higgins:  Okay.  Has the debtor

13 [00:05:00]

14 ever filed for bankruptcy before?

15 Richard Pell:  No.

16 Ben Higgins:  Okay.  And has the debtor opened post-petition bank accounts?

17 Richard Pell:  The debtor is in the process of opening a new debit account.

18 As you know, the account's with Citibank, and Citibank is asking them to find

19 a new bank.  They've stopped opening debit accounts, and it's caused a little

20 bit of delay.  This process started this week.

21 Ben Higgins:  Sure.  These first few questions up front here, they deal with

22 the U.S. trustee requirements and certain things that the debtor needs to

23 comply with in order to be in bankruptcy.  One is to close your previous bank

24 accounts and open what's called debtor and possession bank account, which

25 Mike was just referring to.  For purposes of these requirements, to the

extent there are things outstanding, such as the debtor possession account is

not being opened, what we'll do is, when this meeting is over, we won't

formally close it, we'll continue it to another date.  That doesn't

necessarily mean you have to come back, but it just means the meeting is not

closed until those requirements have all been met, so I'll provide a list of

those things to your counsel.  One of those things will be opening a debtor

in possession bank account.  If Citibank doesn't have it, your counsel should

have a list of authorized depositories that do provide debtor in possession

accounts.  And, with respect to that, I just wanted to point you to—I had it

here.  So one of the things we require, the United States Trusty Program

requires is a declaration that accounts have been closed and new accounts

have been opened.  You have one signed here, but the information isn't

complete, because, well, it hasn't actually happened yet, so we'll need one

of these done when the information is actually complete.

Richard Pell:  Okay.

Michael Conway:  And Ms. [PH 00:06:44] Maronia asked me to sign it upfront.

Ben Higgins:  Okay, right.

Michael Conway:  That's why you have it.

Richard Pell:  Oh, that's the gal I talked to on the phone.  She's very

thorough.

Ben Higgins:  She is.  She is.  She does a good job.  And, as far as the bank

accounts, everything has been closed except for that one Citibank checking

account, is that correct?

Richard Pell:  That's true.

1  Ben Higgins:  Okay.  My next couple questions are about insurance policies.

2  I know you've provided some information to my office.  Can you tell me about

3  the insurance that the debtor currently has in place at this point?  From

4  what I understand, from what you submitted to the office, it appears that

5  there's only two policies currently active.  There's a commercial auto policy

6  and a business management indemnification policy.  Is that accurate?

7  Richard Pell:  By the latter, are you referring to directors and officers

8  liability?

9  Ben Higgins:  Yes.

10  Richard Pell:  Yes, that's correct.

11  Ben Higgins:  As far as the commercial auto policy, your schedules show that

12  there's seven vehicles that the debtor owns.  Are all seven vehicles covered

13  by that one auto policy?

14  Richard Pell:  I'm going to defer actually to Mike or Bill Frey back there,

15  because they've been handling the sort of people picking up the rented

16  vehicles, the leased.

17  Michael Conway:  Yeah, the policy covers those remaining vehicles, and we're

18  in the process of getting permission to sell those vehicles.  Hopefully we'll

19  have everything sold before the policy expires in March.

20  Ben Higgins:  Okay.

21  Michael Conway:  If not we'll have to extend it, but—

22  Ben Higgins:  Currently the debtor doesn't have any type of general liability

23  insurance, is that correct?

24  Richard Pell:  That policy expired in December.

25

Ben Higgins:  Okay.  And, as far as—early in this case, as you're probably

aware, your counsel filed a motion with respect to certain insurance

policies, and attached to that motion there were a list of insurance policies

that the debtor previously had in place.  Among them were general liability

with Colony, excess liability policy with Colony, ERISA 401K bond with

Traveler's, a Putnam County license bond with Traveler's, and a New York home

improvement bond.  As far as I understand it, all those that I just listed

have either expired or are no longer active.  Is that your understanding as

well?

Richard Pell:  Yeah, I mean, some of them became unnecessary when we went out

of the residential construction and installation business in a hurry.

Ben Higgins:  Okay.  I'm going to ask you in a couple minutes about the

change in the business model, what's happened.  But, as far as—is there any

insurance that's customary to a business in your industry at this point that

you don't have in place that you need to get in place?

Richard Pell:  Well, I mean, the most critical one was the worker's comp

insurance policy.  That's really the proximate cause of us letting go our

entire staff, because we were told by the New York State Worker's Comp

Insurance Board that we needed to give them over $700,000 that we didn't

have, and the investors who had financed the company up until that point just

decided we can't have uninsured workers, or we're committing a class E

felony, so we pretty quickly decided to just shut the doors.

[00:10:00]

Ben Higgins:  Right.  And how many employees do you have currently?

Richard Pell:  Let's see, we've got two, I believe.

Michael Conway:  Two part time, hourly-based employees.

Ben Higgins:  And what functions do they serve at this point?

Richard Pell:  Well, basically were trying to recreate the financial records of the company, because financial books and records deteriorated markedly in 2017.  You know, another sort of milestone on the way was our inability to get a 2016 audit completed, and we belatedly discovered that the CEO hadn't even started the process, although he told us somewhere in May that he had commenced that process, but I think there was a little concern about an audit and what an audit might uncover, so they're primarily muckraking.  Eventually we're going to hire forensic accountants to find out where all the outgoing money went, but that's the next step in the process.  We haven't gotten there yet.

Ben Higgins:  Are they handling any new solar installation type business, any—?

Richard Pell:  No.

Michael Conway:  And just to add to what Mr. Pell said, they are contract employees, they are—

Ben Higgins:  I'm just going to move this over, just because you're a soft talker, Mike.

Michael Conway:  They're contract employees who—one of whom was digging in the financials.  The other one is ore a systems analyst who's trying to figure out what the assets of the company are, you know, and what's out there that's been installed based on the record.  So one's dealing with the financial aspect of it, the other's dealing with the asset side of it.  Both of them should be finished with their roles soon, and then we can move to, in

1  order of course, forensic accountant, and then our tax accountant we've

2  spoken with can't start until the forensic accounting's been done.  They've

3  looked at the books and records, but there's not enough information here to

4  do tax returns for 2016 and 2017 without forensic accounting.

5  Ben Higgins:  And that's your understanding as well, Mr. Pell?

6  Richard Pell:  Correct.

7  Ben Higgins:  Okay.  And has the debtor established post-petition books and

8  records?  I mean, post-bankruptcy petition books and records?

9  Richard Pell:  It's a work in progress.

10  Michael Conway:  Yes.

11  Ben Higgins:  Yes or it's a work in progress?

12  Richard Pell:  Yeah, books and records are being established by the

13  bookkeeper, and it was complete enough for us to file our schedules.

14  Ben Higgins:  Okay.  And where are the books and records located?

15  Michael Conway:  The company uses a software called NetSuite, so it's really

16  in the cloud, but the bookkeeper is located—sits in New Jersey at home.

17  Ben Higgins:  The accountant works from home?  That's one of the two

18  employees or—?

19  Richard Pell:  Yeah, so the records are on the cloud, and it's a virtual—

20  either it's a financial investigation or tech work supplied by the other guy.

21  Ben Higgins:  Okay.  One of the other things that you're required to submit

22  to us is your latest tax returns.  I believe we have 2014 and 2015.  From

23  what I understand, 2016 has not been filed yet.  Is that correct?  And that's

24  due to—

25

Richard Pell:  That's correct, due to poor financial books and records being kept by our predecessors.

Ben Higgins:  Okay.  Could you tell me a little bit more generally about the background and the nature of the debtor and the debtor's business?

Richard Pell:  Yeah.  Okay, basically it's a residential construction company on the one hand, but the second aspect of residential solar installation is the financial engineering challenge.  I first got involved with the company in 2015.  Prior to that, the former CEO Richard Kaiser was running the business for a family office out of Salt Lake City, Utah.  My understanding is they invested about 5 million in the business, couldn't make it work.  At the end of the day, Bill Frey ended up buying it for a couple of hundred thousand as they were unable to make payroll in the very near future.  The reason Bill was willing to buy it is his wife Carrie had run into Richard Kaiser at an MIT event.  He started talking about the business a little bit, and Carrie, who's a very bright woman, and she said it sounds like you've got a financial engineering problem, because this business qualifies for federal investment tax credits, but you don't know how to get them.  And the problem with a solar business organized around power purchase agreements, like ours was, is the good news, the revenues come in a stream over 20 years.

[00:15:00]

The bad news is your costs are up front.  So it becomes a real challenge to finance yourself.  So I originally invested because I saw two good things, Richard Kaiser, who I was very impressed with, seemed quite an expert in the solar industry, and Bill Frey I know as he's an award-winning financial engineer.  And, as we started looking at the models for the business, if you

could put together efficient, the construction side of it, another component
is the sales side, that's got to work, a key component is financial
engineering, and I think Bill really put together an industry state-of-the-
art financial model using tax equity providers as well as working capital
facility from the New York Green Bank. They were consistently very helpful,
and New York State is very committed to clean energy and helping to make that
happen. It was good business for us. It was good business for them. And
then final component is management. Business was growing and started in
Suffolk County and Long Island and then into Nassau County. Major move was
to expand into New York City because of local incentives. Actually the
prices we would receive for power sold were very attractive relative to Long
Island, although there are some added challenges of doing business in New
York. It was a business that chewed up money. But, in our minds, the model
was create profitable locations, Suffolk County, Nassau County, Brooklyn,
Queens, Staten Island, use the profits from those operations plus additional
capital sparingly if necessary to further geographically expand the
footprint of the company. We also did that into the state of Massachusetts.
One of the problems was we did a number of financings, and increasingly we
started to lose confidence in the CEO. I think Bill Frey was actually the
first person to figure out there was a problem when he was lied to back in
late 2016 about money he had lent the company and expected to get repaid in a
couple days, and Kaiser said at the Cornell Club I think it was, oh, you're
not getting paid back. And Bill went ballistic. Now, at that point, I was
still sort of drinking the Kaiser Kool-Aid, so I was rushing back and forth
from one room to another trying to calm Bill down and calm Kaiser down, and

```
 1   so things continued.  We did another round of financing in March 2017 where I
 2   think my wife was the main supplier of capital.  Post that financing though,
 3   it became clear that the numbers we had been presented with to raise the
 4   money were inaccurate and greatly understated the actual costs of the
 5   operation.  So the two key components in a profitable solar business is what
 6   do you get paid for the power you sell, the power produced by the panels, and
 7   what does it cost you to get all those panels up on the roof, plus your SG&A
 8   costs and headquarter costs.  So we felt we could be profitable somewhere
 9   between two and three dollars in cost for putting the panels on the roof and
10   covering our headquarters' costs and so forth.  And we were shown numbers
11   that showed we were right there or getting very close to there, with a little
12   additional growth we soon would be there, but then later discovered our costs
13   were probably in excess of $5.00 and a lot of mistaken expenditures and
14   mismanagement was being hidden from us.  So, in June of 2017, we actually
15   made the decision to terminate Richard Kaiser as CEO, although in our minds
16   it was probably a relationship we were going to continue for transitional
17   purposes.  We informed him of that.  Didn't take it particularly well, but we
18   all left the meeting.  The following day he informed us that he was hiring
19   security guards if any of us, the owners of the company attempted to enter
20   the premises, they would be barred from doing so.  Strange position for him
21   to take, but later we kind of understood why he did that.  As we researched
22   all the past documentation, we realized that Richard believed he didn't have
23   to answer to anyone.
24   [00:20:00]
25
```

And that's because in one of the financing rounds, the corporate counsel, the law firm Faber something and something had completely changed the investor rights agreement, which basically made Kaiser in a position where he really didn't seem to have to answer to anyone. Fortunately, we retained Shipman & Goodwin, and through some research into Delaware corporate law, we determined that his assessment was inaccurate and that the owners of the company still did retain some rights. So we hired a couple of pretty beefy former policemen from Newark, New Jersey to accompany us to the premises, and after two hours Mr. Kaiser agreed to sign a resignation notice. He continued to float around the company for a couple weeks, but we put in Kevin Johnson as an interim CEO.

Ben Higgins: What was the timeframe of that?

Richard Pell: Almost immediately.

Ben Higgins: So June of 2017?

Richard Pell: Correct. And historically Richard Kaiser had always tried to kind of keep investors at arm's length from the corporate headquarters. Carrie Frey did assist him in some specialized tasks. We always felt everything ran through him. He was in a position of seeming to want to control everything, and, as the business grew in complexity, we felt, well, you need a bit of a management team here. You need a Chief Operating Officer. You could benefit from a Chief Financial Officer. You could certainly benefit from a Head of Operations. You could benefit from a Head of Sales. So Carrie spent a lot of time interviewing potential personnel, but, for whatever reason, they all seemed to fall short of Richard's standard, so the management team continued to be more or less him. The few

people he did hire seemed to us inferior candidates among the ones presented

to them, but they were less threatening to him personally. So basically we

went inside the company. It was our intention to transition it eventually to

a pure financing company, because, if we decomposed the elements of what we

were doing, I think sales, everything from sale of the system to turning on

the power as operations I'd call it and then the back end financing the whole

thing, we felt actually the greatest value in our company was state-of-the-

art financing. Actually to give Mr. Kaiser credit, I think the operating

part of the company that he built was very good, everything from the customer

agreeing to buy to turning on the power, we had very good array design

people, permitting people to work through the various municipality

requirements to get a permit. I think the construction was very efficient.

They re-engineered the design of the trucks delivering the panels. So I

think the operational aspects of the company were very good. The sales

system was very flawed. It was something I would describe as based on the

old Encyclopedia Britannica model. When I was a kid, they used to have these

people selling these sets of encyclopedias door to door. They've all kind of

been made redundant by Wikipedia and the Internet and so forth. So it was

actually a huge door knocking operation. I think at one point Richard Kaiser

calculated that we had knocked on a million doors. But it was a very

expensive sales operation. The other thing that happened was, as we moved

from Long Island into New York City, we had demanded, and Richard eventually

acquiesced to giving us monthly figures on what was sold, what was permitted,

what was installed. And we noticed as New York City started rising, Long

Island started collapsing, because he had had to move key personnel from Long

Island to get the New York City initiative up and rolling, and that basically cannibalized our ability to sell and install new systems in Long Island. We actually at one point were talking to a source of potential equity, a guy very experienced in private equity, and he reassured us a little bit. He said this is not that uncommon. Let me guess. You tried to expand geographically and cannibalized your earlier operations. And he said I've seen this movie over and over again. It's probably a fixable problem. But, once

[00:25:00]

we realized that key financial information had been hidden from us, that we'd been presented with faulty presentations, as we started to dig into the true financial condition of the company, we realized we had a problem we had to restructure. Initially, as I said, the plan was to slowly migrate from a fully vertically-integrated company to something that was definitely more tilted towards leveraging our financing expertise, possibly finding a way to leverage our operational capabilities, which were good, but getting out of the current sales model. And then we discovered that our workers' comp insurance hadn't been paid, and that was really the proximate issue which forced us to very quickly close the business. We just thought it's a Class E felony to have workers on rooftops and all kinds of dangerous places without insurance, and we weren't willing to put in more money into the company at that point, nor were we willing to commit a Class E felony.

Ben Higgins: What was the timeframe that you discovered the workers' comp insurance hadn't been paid?

Richard Pell: I believe it was August of 2017—was it September?

```
 1   Michael Conway:  Shortly after a worker fell off a roof in Massachusetts.

 2   Ben Higgins:  Okay.  I'm going to go back into what you said a little bit and

 3   ask just for my own edification, to make sure I understood some of that.  You

 4   talked about how you had previously a fully integrated model is how you

 5   described it, so everything from sales to installing to the actual financing

 6   piece of it.  You handled every piece of that.

 7   Richard Pell:  Correct.

 8   Ben Higgins:  And, as far as the agreements with homeowners, would that have

 9   been an agreement between the individual homeowner and the debtor itself?

10   Richard Pell:  Correct.  And just to back up, there are two kind of main ways

11   of doing this in the business.  We use the PPA model, which is the homeowner

12   signs and agreement to purchase the power from panels we own on their roof

13   for 20 years.  And the appeal to that for them is they have to put up no

14   money, and they save significant amounts off of their current electricity

15   bill.  There's a second model which may become more prevalent in the industry

16   which is basically the homeowner buys the system.  You sell it to them, you

17   get it installed, you help them with permitting, and the advantage for solar

18   companies is so many of them have not been able to figure out the financing,

19   and with the reduction in the U.S. corporate tax rate, the ability to get

20   that financing may become a lot more difficult.  That's a whole separate

21   issue.  So we may find the industry gravitates towards the pure sales model.

22   Ben Higgins:  I see.  So, with your model, the debtor continues to own the

23   actual physical array that gets put on the roof.

24   Richard Pell:  Correct.

25
```

Ben Higgins:  And the customer doesn't actually pay anything to have that

installed, is that correct?

Richard Pell:  Correct, we would do it for free.

Ben Higgins:  And the way you generate money is the array produces

electricity, you then sell that electricity back to the customer and into the

grid if there's excess electricity?

Richard Pell:  Correct.

Ben Higgins:  So are you getting a payment stream from the customer and from

the—is it the electric company?

Richard Pell:  Yeah, in a perfect world, your homeowner is paying you for the

power at an agreed rate, and I think there's some escalator cause each year,

you know, something approximating the inflation rate.  And then,

surprisingly, although you'd think we'd be a competitor, companies like Con

Ed or Long Island Power, they're willing to pay us for the energy.  You know,

we'll wheel it to them over the grid.  They'll pay us for the excess power

that the homeowner's not using, and the reason they're willing to do that is

getting our power, particularly at peak power periods, typically in the

middle of the day when the sun is shining, is when a lot of people is using

electricity, if they can get that power, it allows them to push out for a

number of years in the future their need to build the next multi-billion

dollar power plant, which they don't want to have to do.

Ben Higgins:  Right.  And do you have written agreements with the power

companies or how does that work?

Richard Pell:  That's over my pay grade.  Technically—Bill, do we have

written agreements?

William Frey:  [INDISCERNIBLE 00:29:43].

Richard Pell:  Yeah, that's kind of in the technical expertise of the company but above my pay grade.

William Frey:  It's actually a [INDISCERNIBLE 00:29:53].

Ben Higgins:  Mr. Frey, would you mind if I swear you in so I can— [00:30:00] are you open to testifying to the extent that there's questions that you can weigh in on?

Richard Pell:  He's just got a bad cold.

Ben Higgins:  Could you please raise your right hand?  Do you swear or affirm to tell the truth, the complete truth, and nothing but the truth?

William Frey:  I do.

Ben Higgins:  And could you please state and spell your name for the record?

William Frey:  William Frey.  F-R-E-Y.

Ben Higgins:  Okay, and just I doubt the recording got what you just said. So my question was whether or not there's agreements with the power companies that the debtor has?

William Frey:  The risk is taken by the homeowner, but right now my understanding is New York State law allows the homeowner to sell the excess power to the grid.

Ben Higgins:  So the homeowner is the one actually selling the—?

William Frey:  It's called the net meter, so the power that gets produced, [INDISCERNIBLE 00:30:58] power is 22 cents a kilowatt hour, we sell to them at 15 cents a kilowatt hour.  So, if the homeowner sells it back to the grid,

they're getting 22 cents a kilowatt hour while they're paying us 15 cents a
kilowatt hour, keeping a 7 cent arbitrage.

Ben Higgins:  So the money that's coming to you, it's coming from the
homeowner and not the power company?

William Frey:  The homeowner.  And the power company would offset the power
that they sell the homeowner with the cheaper power that we're selling them.

Ben Higgins:  I see, okay.  And, as far as your agreement with the homeowners
themselves, you have written agreements with each of these homeowners that
you have this kind of arrangement with?

William Frey:  Yes.

Ben Higgins:  Yes, okay.  And about how many of those agreements are
currently outstanding?

William Frey:  We've installed 2700 systems, and we have or had, pardon me,
we've installed 2700 and turned them on.  We have another 250 that have been
installed and not turned on, that U.S. Bank has not thrown a switch yet, and
then we have about another 750 that we had contracts with the homeowners,
which are likely never going to come to fruition, because U.S. Bank did not
actually do anything.

Ben Higgins:  When you say contracts with the homeowners, these are homes
that don't have equipment on it yet, you had installation contracts to
install equipment, and those, because of the holdup with U.S. Bank, you don't
think those will actually come to fruition.

William Frey:  I think those assets have been destroyed.

Ben Higgins:  Okay.  And, as far as equipment that you did install, you said
there were 2700 systems that you installed and turned the power on and 250

1 where you installed and the power has not been turned on yet, and the debtor

2 would have—

3 William Frey:  The term is placed in service.

4 Ben Higgins:  Okay, placed in service.  And you would have, not you, the

5 debtor would have an agreement with each of these homeowners.

6 William Frey:  Yes.  Well, we assign the agreement to various funds.  So

7 those 250 have been assigned to fund, Level Solar fund four, which U.S.

8 Bank's [INDISCERNIBLE 00:33:10] remove level as managing member.  They took

9 over as managing member and then did not throw the switch to turn the 250

10 systems on and basically stared at the other 750 until they went away.

11 Ben Higgins:  That was fund four, you said?

12 William Frey:  That was fund four, yes.

13 Ben Higgins:  This might be a good time—I was going to get into this at some

14 point, but it might be a good time to kind of just get a sense of the

15 overview of the company.  So this is a copy, this is a blown up copy of what

16 was in Mr. Pell's affidavit.  It appears to be—I have extra copies if there's

17 anyone out there that needs it.

18 Richard Pell:  Pretty straightforward.

19 Ben Higgins:  Yeah, right, lines going every direction.

20 William Frey:  What mind would put something like this together?

21 Ben Higgins:  That's a good question.  So just maybe we can piece through it

22 a little bit, so the debtor is the entity in the top box.

23 William Frey:  That's the entity that went bankrupt, right.

24 Ben Higgins:  Correct.  And then you have these other entities, starting with

25 Level Solar Master Holdings, and then there's various entities below them.

1  Those are all non-debtor entities.  None of those entities have filed for

2  bankruptcy, correct?

3  William Frey:  That's correct.

4  Ben Higgins:  Are any of those actually operating companies?  Do they—?

5  William Frey:  No, they're all just shells with assets.  Level's on its way

6  to becoming a shell with assets.

7  Ben Higgins:  And I believe the affidavit of Mr. Pell, it explains that some

8  of these entities were formed to facilitate the financing.  Mr. Pell was

9  talking about how this is a business that requires a lot of upfront capital,

10 so you needed to get the money upfront from the banks, and the banks required

11 or wanted some of these entities formed for the purpose of the actual

12 lending.  Do I understand that?

13 William Frey:  The bankers and remote entities.  So the reason for them

14 [00:35:00]

15 is to isolate the various risks and cash flows.

16 Ben Higgins:  I see, okay.  And, as far as from what I can tell from the

17 papers, there are two primary banks that you did the lending with, New York

18 Green Bank and First Star Development, is that correct?

19 William Frey:  Well, First Star Development also had certainty as an

20 investor, and fund one has Henry Howard, a client of mine on other deals, as

21 an investor in level, and fund two has Level Solar as an investor where they

22 took the tax credits.  Fund three has just U.S. Bank or Fund Star or whatever

23 it was called, First Star.  And four is a partnership between CertainTeed and

24 U.S. Bank.

25

```
 1  Ben Higgins:  Okay.  What's the relationship between First Star and U.S.
 2  Bank?
 3  William Frey:  I think they're one and the same, but—
 4  Ben Higgins:  Okay.  You've been referring to them today as U.S. Bank, and in
 5  the papers it's First Star, but just for clarification you think they're the
 6  same entity.
 7  William Frey:  My understanding, they're the same.  I'm using them
 8  interchangeably.
 9  Michael Conway:  Just to clarify or correct something that Mr. Frey said, the
10  new manager of funds three and four is Numame, which is an entity that was
11  produced by First Star, just so the record is clear.  Numame is spelled N-U-
12  M-A-M-E.  We're still waiting for an address on Numame.
13  William Frey:  It's an employee at U.S. Bank that handles that.
14  Ben Higgins:  Okay. And these entities, the Level Solar Master Holdings
15  Incorporated, that's 100% owned by the debtor, that's correct?
16  William Frey:  Essentially what that is, you can take the cash flows from—you
17  put an array on the roof, we own the array, Level owns the array.  We sell
18  that array into an SPV.  We split the tax benefits off to U.S. Bank or Henry
19  Howard or partnership of U.S. Bank and CertainTeed Corporation.  We then own
20  the annuity, the 20 year annuity.  That gets pledged to Level Master
21  Holdings, and U.S. Green Bank lent money against that block of cash flows.
22  That, if you look at it, it starts to look and smell like a 20 year mortgage.
23  Ben Higgins:  Mm-hmm.  Excuse me a second.
24  William Frey:  This is obvious, right?
25
```

1    Ben Higgins:  So to the extent there's a right to payment from some of these

2    agreements, that was initially—it was just an agreement between the debtor,

3    the Level Solar Incorporated and the homeowner, and at some point certain

4    rights under those agreements were assigned to some of these other entities,

5    do I understand that correctly?

6    William Frey:  Yes.

7    Ben Higgins:  And were those done as each agreement was made?

8    William Frey:  Done on a flow basis.

9    Ben Higgins:  On a flow basis, okay.  And the relationship, well, I'll skip

10   that for now.  And since the issues with Richard Kaiser, as Mr. Pell said,

11   you thought you were not getting all the financial information.  When some of

12   this information came to light and you decided that you needed a

13   restructuring and the worker's comp issue arose and you needed to shut down

14   the business, now you're no longer looking to have this fully integrated

15   model where you're selling the agreements to the homeowners and actually

16   installing the systems yourselves.  Is that correct?

17   William Frey:  Yeah.  There's no reason to have—we've been approached by many

18   smaller companies or companies about the size of level that seek to use the

19   financing that we were able to establish from them, so the question that's

20   facing Richard and me is when the dust settles, do we want to do that?  And

21   right now we just don't have the bandwidth to do 10 levels and provide the

22   financing.

23   Richard Pell:  And the challenge will be to find a supplier of tax equity,

24   because it's become more scarce, but there may be a business there.

25

Ben Higgins:  And, when you say you want to use the financing model that you

established for level, you mean there would be some agreement with these

current lenders or a similar model with different lenders?

William Frey:  Well, based on the way—I mean, the New York Green Bank has

been excellent.  U.S. Bank looked and watched as they were a managing member

and watched $35 million of assets be burned to the ground.  I have a problem

with that when it's my money, especially when they control it.  So

[00:40:00]

I would be reluctant to bring them in.

Ben Higgins:  Right.  And the type of model that you would employ going

forward, it would be reaching agreements with homeowners similar to what you

had with Level Solar where some lender, New York Green Bank or somebody else,

would come in, fund the money upfront, the agreement would be with the

operating entity, and then some of the rights to those streams of payments

would then be assigned to these new entities.

William Frey:  We would have to find a new partner to take the investment tax

credits, and there are a number out there.  I just don't know whether they'll

do it in this—when the world changed a month ago, the change in the tax code.

And then we would have to find a leverage facility, either New York Green

Bank or some other facility.

Richard Pell:  And that's doable.

William Frey:  That's doable.  I mean, this can be replicated, if we want to

put our time into it.

Ben Higgins:  Okay.  All right.  So currently you said you have two

employees.  I believe you have monthly payroll of $20,000.  Is that correct?

Richard Pell:  It would probably even be less than that, but we're estimating that that's where it would be at first.

Ben Higgins:  And that will just be for those two employees?

Richard Pell:  That's right.  The other folks are working [INDISCERNIBLE 00:41:20].

Ben Higgins:  And the other folks, just for clarification, so, Mr. Frey, you're listed as a CEO.  Mr. Pell, you're the secretary.  And, Mr. Frey, your wife Carrie Frey is the treasurer, is that correct?

William Frey:  That's correct.

Ben Higgins:  Are there any other officers or directors of the debtor?

William Frey:  No.

Ben Higgins:  And previously Mr. Kaiswer had been the CEO of the company, and—

William Frey:  That's correct.

Ben Higgins:  And who were the other officers previously of the debtor?

William Frey:  Was Scott?

Richard Pell:  I don't know whether Scott was technically an officer or not.

Ben Higgins:  Right, so I have—I'm looking at the statement of financial affairs, which, for the record, is docket number 36, and it looks like previously Richard Kaiser and then Scott.

William Frey:  Yeah, Scott was the financial guy.

Ben Higgins:  How do you pronounce Scott's last name?

William Frey:  Paterniani.  I'm sorry.

Ben Higgins:  No, that's okay.  For anybody who has to type up that transcript, that's P-A-T-E-R-N-I-A-N-I.

Male:  Is he an officer?

William Frey:  Yeah.  Well, he was the controller of the company.

Ben Higgins:  And what was his role in the company?

Richard Pell:  Lying to us.

William Frey:  His official role was producing financial books and records, overseeing the conveyance of financial information based on where Richard Kaiser needed it, helping with the spread sheets to put presentations together, dealing with banks.  We just—I mentioned earlier that we were pressing Richard at various points to broaden the management team to include a CFO, because, as the business was increasing in complexity, we just felt the sophistication needed in the key financial position was going to be larger and larger.

Ben Higgins:  As far as the debtor's current slimmed down business, do you know what the total monthly expenses are at this point?  I know you probably have been working out the monthly operating report at this point.  I don't know if you—

William Frey:  Salaries plus another 6,000 or so, $2,000—

Richard Pell:  Software, we want to keep some of our software systems running.

William Frey:  Plus lawyers.

Michael Conway:  There was a discussion as early as this morning about whether to keep certain software, inventory software in place which would add a few thousand dollars, but we're not sure yet, but it's fairly much in line with what was in Mr. Pell's estimate, in his declaration, which is I believe exhibit A.

Ben Higgins:  Yeah, I believe you're correct with that.  And does the debtor

have a physical location at this point?

Richard Pell:  Closest thing is my office in Greenwich.

William Frey:  The cloud.  I mean, basically we've surrendered all our

premises.

Ben Higgins:  So you're not currently paying any rent at this point?

William Frey:  No.

Ben Higgins:  Okay.

Richard Pell:  We get our mail delivered to a PO box in Greenwich.  My

personal assistant gets it.  She opens it, sorts it, arranges to get whatever

paid paid and, you know, she keeps the admin side going along with Peg, the

accountant.

Ben Higgins:  And she's one of the two employees?

Richard Pell:  No, she's an employee of mine.

William Frey:  You're talking about Peg or you're talking about Sharon, his

assistant?  The accountant?

Richard Pell:  Peg is paid by level.  Karen is—

William Frey:  Sharon is paid by me or my company, which is me.

[00:45:00]

Ben Higgins:  Okay.  And the debtor still has revenue coming in, correct?

William Frey:  Revenue, there's several sources of money coming in.  First is

money that comes in through the PPAs, which basically goes to the funds and

goes to U.S. Bank or First Star and New York Green Bank indirectly through

Level Master Holdings.  The second source of revenue is Level has some number

of arrays that forever, for whatever reason, did not go into the funds, and

we get a few thousand dollars a month, a minimal amount of cash from those.

And then the next source of revenue is we own what's called an SREC, a solar

renewable energy credit in Massachusetts, and I believe that that's about

$15,000 a month. I don't know at what point in time we're paid that. I

believe it's quarterly, and I don't know that we've gotten that cash yet.

Ben Higgins: And that's coming from the state of Massachusetts?

William Frey: That's correct.

Ben Higgins: The money coming from the PPAs that's going directly to the

funds—

William Frey: At the end of the day, that's paying off the Green Bank

through Level Master Holdings. So, while Level does not get the cash,

Level's liabilities in direct through the Master Holdings are being increased

as that's being paid down.

Ben Higgins: Was Level a guarantor of loans that were made to—?

William Frey: No, Level's not the guarantor. The credit of the asset in

Level Master Holdings, Level Solar Master Holdings is a diversified pool of

20 year streams of cash flows from homeowners from the electricity payments.

Ben Higgins: So just to make sure I understand what you're saying correctly,

that money is going to pay down the secure creditors.

William Frey: That are in the banker's remote [INDISCERNIBLE 00:47:05].

Ben Higgins: Right, and to the extent that those loans are eventually paid

off, then that revenue stream is then something that could be moved back up

to the debtor.

William Frey: Correct.

Ben Higgins:  Okay.  And then some of the arrays you said were just purely

owned by the debtor, they were never assigned to—

William Frey:  A small number.

Ben Higgins:  Do you know roughly how many?

William Frey:  A couple dozen, one or two dozen.

Richard Pell:  I think I've found about 50.

William Frey:  50.  I didn't mean to mis-number.

Richard Pell:  I think I've got them all by homeowner now, so I just don't

remember the number.

William Frey:  Let's put it this way, I didn't know about them until we—

there's a lot of things I didn't know until we—

Ben Higgins:  How much money would you get from one array in a given month?

William Frey:  $100, $150.  It would depend on the array, it would depend on

the month of the year, but $1500 a year, something like that.

Richard Pell:  Yeah, depends on the size of that roof, depends on the

radiation factor, so—

William Frey:  It's not 100, it's not 10,000.

Richard Pell:  So the same sized roof will give you more power in New York

than it will in Massachusetts, which is further north.

Ben Higgins:  Okay.  To the extent that the debtor has post-petition

expenses, are those being paid on time?  I mean, you mentioned there's no

rent.  I guess there's just salary and potentially software.  Are there any

other current expenses that the debtor has at this point?

William Frey:  No, not really.

Richard Pell:  Just the insurance and then administrative cost, which we have

not actually been approved yet as counsel, but eventually there'll be a legal

expense, and then there'll be an expense for the forensic accountant, but

there'll be no other operating expenses.

Ben Higgins:  Okay.  And you don't have any leases anymore.  You've left all

the premises, and I assume you intend to reject all the leases.  Is that—?

William Frey:  Correct.

Richard Pell:  I think there's an issue with one facility where we got

trucks, and they haven't been able to get the trucks out of the warehouse or

something.

Ben Higgins:  Well, where are the trucks at this point?

Richard Pell:  Bill, are you still driving one from one place to another?

William Frey:  No.  I believe there's three left in Massachusetts that we do

not own where we've told the banks take them back.  I don't know whether

they've come and picked them up.  There were three that were inside a

warehouse in Brooklyn, and the landlord wanted us to come and open the door,

and—

Michael Conway:  Those are not owned by Level Solar.

William Frey:  Those are not owned by Level Solar.  There was also a forklift

there.  I think we told him to walk across the street and open the damn door,

otherwise he's not going to get his warehouse back.

Michael Conway:  If I may, was your question what vehicles does the debtor

have?

Ben Higgins:  Yeah, my question is, yeah, the seven vehicles that are listed

on the schedules, where are those?

```
 1   William Frey:  There's three classic VW buses

 2   [00:50:00]

 3   that Kaiser, for whatever reason, decided he needed to own with our money.

 4   Those are in the Hicksville Office.

 5   Richard Pell:  I think everything's in the Hicksville location other than one

 6   truck, who it's sitting with a dealer that's a subject of a motion to sell.

 7   William Frey:  I think they may be in Ronkonkoma.  I think they're in the

 8   Ronkonkoma office.  There may be one or two in Hicksville.  The rest of them

 9   are in—okay, there's vehicles that are going back.  I'm not sure whether

10   they've been picked up yet.  The banks have been notified.  They've picked up

11   a lot of them.  They haven't picked up all of them.

12   Ben Higgins:  When you say going back you mean being repossessed by the

13   banks.

14   William Frey:  Repossessed.

15   Richard Pell:  Yeah, there are different lenders like [PH 00:50:44] Ally, I

16   think Wells Fargo was one, and some were prompt in retrieving their vehicles,

17   others were not.

18   William Frey:  The three Volkswagen buses are in Hicksville.  I believe the

19   rest of the vehicles that we own outright are in Ronkonkoma, but there are

20   vehicles in Massachusetts, probably last I heard Massachusetts, Brooklyn,

21   Hicksville, and Ronkonkoma that still need to be repossessed.  They're not

22   part of the seven vehicles.

23   Ben Higgins:  Okay.  And, when you refer to the Hicksville office or the

24   Ronkonkoma office, what is—as far as I understand, the debtor doesn't have

25   any physical location at this point.  Are you—
```

Richard Pell:  Yeah, but formally we had a warehouse and office space in—

William Frey:  We basically—I've talked to the landlords, and the trucks are still out in the back.

Ben Higgins:  And based on—you had a lease with the landlord.  It still technically hasn't been rejected yet and the—

Richard Pell:  Have we rejected it?  I think we've rejected them.  We've surrendered them.

William Frey:  We have agreements pre-petition to surrender leases.  Part of the agreement was we store the vehicles there until we dealt with them through the bankruptcy, so we have vehicles that with everything goes according to plan will be picked up by an agent who will sell them on his lot on a commission basis.  We have to get that approved by the court.  And we have one vehicle, like I said, which is subject to an offer to purchase right now, so six vehicles to be picked up and sold on a commission basis, one vehicle already at a dealer who's made an offer, and, if it's approved, that dealer will take that.  But they are sitting right now in a location where we have a surrender agreement that allowed us to store the vehicles after surrendering the property.

Ben Higgins:  Okay.  But you're not currently paying anything to the landlord for that, and they're just basically letting you keep the vehicles there?

William Frey:  That's correct.

Ben Higgins:  All right.  I'm going to run through your schedule quickly with you.  So I'm looking at this is ECF number 35, for the record.  These are the schedules that were filed in this bankruptcy case.  Mr. Frey, had you seen these schedules, have you reviewed these schedule before?

William Frey:  I've skimmed them.  I have not carefully reviewed them.

Ben Higgins:  Okay.  First off, you have your bank accounts.  We've discussed those already.  From what I understand, the certificate of deposit has already been closed, and the Citibank checking account is in the process of being closed.  I'm on the front page of the schedules.

William Frey:  I know we're in the process of looking for a debiting account. Where we are in the status of these two accounts—has Peg closed them?

Richard Pell:  I think CD account is closed.

William Frey:  My understanding is the CD is closed.

Richard Pell:  And that money was just deposited into the checking account.

Ben Higgins:  Okay.  Turning to the next page, you have listed is $31 million in accounts receivable over 90 days old.  I assume these are your rights to receive payment through the homeowner agreements.  Am I understanding that correctly?

William Frey:  Yes.

Ben Higgins:  And, to the extent it says they're over 90 days old, it's not a case of you haven't been collecting them, correct, or there's nothing that the debtor has to do to go to collect these?

William Frey:  Just sit, in the next 20 years we get the cash flows.

Richard Pell:  A lot of it's ACH, automatic monthly.

Ben Higgins:  It's automatic transfers, okay.  The next page you have the entities that the debtor has 100% interest in, so based on the chart we talked about Level Solar Master Holdings.  I have the wrong piece of paper here.  So this entity here.  And then there's also listed 100% interest in Level Solar fund two, which on the chart in the affidavit it said the line

here goes directly to level Master Holdings, but is it correct that the

debtor actually owns 100% of that entity or—?

Richard Pell:  Let me ask you, you asked earlier whether there's anything

that needs to be changed.  This is a question

[00:55:00]

more because, when we initially filed, it was assumed it was owned by Level

Solar Master Holdings.  It was in the chart.  Then we found documents that

Richard Kaiser had that indicated it was owned by Level Solar Inc., which is

what went into the schedules.  Since these schedules were filed, I've been

provided information which might mean that it's actually owned at the level

Solar Master Holdings level.

Ben Higgins:  So you're—go ahead.

William Frey:  Can I explain the economics of this?

Ben Higgins:  Please.

William Frey:  Level Solar Inc. got the investment tax credits from fund two.

All the cash flows after that get assigned to Master Holdings, or almost all

of them, if it's not all of them.

Ben Higgins:  And four—so pardon me thinking with my lawyer brain and not my

businessman brain, but the entity that technically owns Level Solar fund two

is not clear.  Is that—

Richard Pell:  It's not clear to me at this point in time, so, when you ask

whether we have to change anything, that might be something that needs to be

changed.  [PH 00:56:12] Aiden Gump did the actual deal work here, and they're

the ones that provided me some information that leads me to believe that it

might be at Master Holdings level, but I haven't had that phone conversation

yet with the attorney who has the historical knowledge. But, once we have

that, if it needs to be fixed, we'll fix it. The audit, there were supposed

to be audits done every year, there weren't. But the 2015 audit which was

done in 2017, it looks like, indicates that it was owned by Level Solar Inc.

So the question in my mind was, well, if the auditors found it was owned by

Level Solar Inc., that should be in the schedules, but now it may be that was

incorrect.

William Frey: I think you have to separate the tax credits from the annuity

portion. The tax credits have already been generated by level two. Those

would have consolidated with a tax bill Level Solar Inc. hat. So from an

economic point of view, the rest of the cash flow is going to Level Solar

Master Holdings, so whether it's a dotted line to Level Solar Inc. and then

down, it doesn't really matter. The money goes—

Ben Higgins: Right, where the money is going is to—

William Frey: The money goes to Master and they're too paying Green Bank.

Ben Higgins: And, just so I understand correctly, we had spoken earlier that

the debtor Level Solar Inc. was the managing member of Level Solar Master

Holdings and is no longer the managing member of that entity, is that

correct?

William Frey: It's no longer the managing member of Master Holdings or one,

two, three, or four.

Ben Higgins: Who is the managing member of Master Holdings?

William Frey: Green Bank has taken over.

Ben Higgins: And are there other members of the LLC?

```
 1  William Frey:  I think it's 100% owned by Level Solar, so Level Solar Inc.

 2  presumably is a member of that LLC, but not the managing member.

 3  Ben Higgins:  Okay.  And, besides New York Green Bank and Level Solar Inc.,

 4  are there any other members of that LLC?

 5  William Frey:  I don't believe so.  You know of any?

 6  Richard Pell:  No.

 7  Ben Higgins:  And, of the four funds, so Level Solar is no longer the

 8  managing member of any of those four.

 9  William Frey:  That's correct.

10  Ben Higgins:  That's correct.  And I think you already said this, but I just

11  want to make sure I have it clear in my head, who is the managing member of

12  Level Solar fund one?

13  William Frey:  Green Bank.

14  Ben Higgins:  And who's the managing member of fund two?

15  William Frey:  Green Bank.

16  Ben Higgins:  And fund three?

17  William Frey:  U.S. Bank.

18  Ben Higgins:  And fund four?

19  William Frey:  U.S. Bank or Numame, whatever you want to call it.

20  Richard Pell:  Numame LLC.

21  Ben Higgins:  And Numame is an entity that you believe was formed by U.S.

22  Bank?

23  Richard Pell:  It was formed by First Star.

24  Ben Higgins:  By First Star, okay, that's helpful.  Thank you.  Sorry for

25  going through that again.  Just turning back to the schedules.
```

William Frey:  This wasn't obvious?

Ben Higgins:  Took me a few reads to try to get a handle on it.

William Frey:  You can begin to see why the solar industry has some problems figuring out how to finance itself.

Ben Higgins:  You've listed some inventory, that's actual hard solar equipment that the debtor still possesses.

Richard Pell:  I'm trying to give it back to the—

William Frey:  There's very little.  How much is listed there?

Ben Higgins:  It's listed as unknown amount.

William Frey:  It's a de minimis amount.

Ben Higgins:  A de minimis amount.

William Frey:  I would put it at zero at this point.  Everything that we can have of value has gone back with maybe a handful of panels that are in conception.

Richard Pell:  Actually Bill and his wife Carrie have been doing the service trying to connect suppliers of panels with where they're left in warehouses and get rid of them as efficiently as possible.

Ben Higgins:  And to the extent there still is some hard material—

William Frey:  I would say it's de minimis.  If it's $10,000, I'd be surprised.

Ben Higgins:  Okay.

[01:00:00]

Richard Pell:  The reason for that is pre-petition some of the suppliers picked up their inventory.  There may have been some left behind because it was open or broken.  So it's dent and scratch material any leftover.

William Frey:  Yeah, there was some breakage.  Think of those horrible

advertisements about the movers.

Ben Higgins:  I've experienced that.  Okay, we've gone over the vehicles

already.  I don't think we need to go through that again.  There's some IP

listed, so you have some trademarks, the domain name, LevelSolar.com, and

then some sales data.  Anything you want to add to that, that portion of the

debtor's assets?

William Frey:  I guess we discovered our trademark is pretty much a global

trademark, yeah?

Richard Pell:  Yeah, he's hired lawyers to secure the Level Solar brand all

over Europe, all over the world.

Ben Higgins:  And when you say he, you mean Richard Kaiser?

Richard Pell:  Kaiser, yeah.  That was sort of interesting, given that I

wouldn't let him go into Rhode Island.

Ben Higgins:  Okay.  And speaking of Richard Kaiser, the next item I wanted

to ask about on the schedule, so you have causes of action, un-liquidated

claims of not less than $35 million against Richard Kaiser, former employees,

and other third parties.  I guess first who else do you potentially have

claims against besides Richard Kaiser?

William Frey:  U.S. Bank.

Ben Higgins:  U.S. Bank.

William Frey:  They took over as managing member and burned 35 million of

assets to the ground.

Richard Pell:  There are other parties.  I don't know if we want to go

through the whole list.

Michael Conway:  Yeah, without going into too much detail because of confidential nature, but there were a number of employees who left taking confidential information with them in violation of their agreements not to do so, took it to other companies.  Those companies then went to the homeowners that we had contracts with and convinced them to breach those contracts and allow their new companies to build the panels.  Earlier Mr. Frey indicated that there were 750 or so homes that were considered assets that were burnt to the ground.  We believe the majority of those were taken by other competitors who utilized the former employees that sold those homes initially, hired those employees, and then convinced the homeowners to breach their agreement with Level Solar and then renew agreement with a competitor. So there'll be litigations relating to those former employees who breached their agreements and their new employers.  They are separate and apart from any claims against Richard Kaiser.

Ben Higgins:  Is that your understand as well, Mr. Pell and Mr. Frey?

William Frey:  Yeah.

Ben Higgins:  Is that accurate?

Richard Pell:  Correct.

Ben Higgins:  Okay.  To the extent that there is anticipated litigation against former employees, Mr. Kaiser, U.S. Bank—

Richard Pell:  That may be First Star.

Ben Higgins:  First Star.  I'm not going to ask you for your litigation strategy, but have you made any steps towards any of this?

William Frey:  Yes.

Michael Conway:  We've been conducting interviews with a number of folks.

```
 1  Richard Pell:  We've also sent legal hold letters out to most parties.

 2  Ben Higgins:  Okay.  You also have—going back to your schedules, what's

 3  listed as assets, you have capitalized solar arrays of just shy of $10

 4  million.  Could you just explain what that line item means?  What you mean by

 5  that?

 6  William Frey:  I would guess that that's the equity level has in Master

 7  Holdings, but I'm not sure.

 8  Richard Pell:  It was explained to me that that was the residual value of the

 9  Level Solar-owned projects that didn't get transferred.

10  Ben Higgins:  The 50 arrays that you mentioned before.

11  William Frey:  No, the 2700.

12  Ben Higgins:  Oh, okay.

13  William Frey:  I would think that once we pay off Level Solar Master

14  Holdings, that money is the back end of that deal.  That's what I would think

15  it is.  I could be wrong.

16  Richard Pell:  And it could be a combination of both.

17  William Frey:  Yes, the 50 systems that are Level Solar are not worth a lot

18  of money.  That's a million buck's worth of systems.

19  Ben Higgins:  So the—okay, we'll leave it there, unless

20  [01:05:00]

21  you want to add anything to that, Mr. Pell.

22  Richard Pell:  No.

23  Ben Higgins:  All right, so that's it for assets.  Skimming ahead, so for

24  secure debt, because of this financing model that you had, it seems all the

25  secured debt was done at the lower level entities, and the only secured debt
```

you have listed on your schedules, they don't actually appear to be lenders.

There's just the lenders for the actual solar panels, there's the vehicle

loan, and then there's Cooper Friedman Electrical Supply.  Is my

understanding correct?

William Frey:  That's correct.

Ben Higgins:  And could you tell me about—Cooper is also listed as an

unsecured creditor for I think $4 ½ million.  Could you tell me about the

debtor's relationship with Cooper?

William Frey:  Well, initially we bought our panels directly from LG, a

Korean panel manufacturer.  They yanked our credit at some point.  That

should have been an early warning signal in our brain, but we didn't really

get it.  Coopers is a distributor.  They'll take panels from LG, from

anywhere, and they warehouse them, and they're a middle man.  We were a good

customer of Coopers.  Kaiser wanted them to become a supplier of working

capital to the company.  They were very accommodating.  So they gave us very

generous credit terms basically they did a warehouse for panels.

Richard Pell:  We found out of the magnitude of Coopers after we threw Kaiser

out.

Ben Higgins:  I see.

Richard Pell:  We didn't know he had borrowed $5 million.

Ben Higgins:  I see.

William Frey:  The business was consuming more cash then we realized based on

the phony numbers that we had been looking at, so constantly looking for the

next source of money to plug the hole.

Ben Higgins:  Okay.  The only other—well, I shouldn't say that, but you also list as an unsecured creditor QED LLC which has a $7.5 million unsecured claim.

William Frey:  That's me, that's my family office.

Ben Higgins:  Okay.  And that's an LLC that you own?

William Frey:  I run investments out of QED.

Ben Higgins:  I see.  And QED is also listed as a shareholder.

William Frey:  That's correct, just an investment vehicle.

Ben Higgins:  Okay.  And did you—so QED loaned money to the debtor, is that what that $7.5 million is?

William Frey:  Correct.

Ben Higgins:  And when was that loan made?

William Frey:  15, 16, 17, you know.

Michael Conway:  Probably four financings are included in that number.

Richard Pell:  You were part of the revolver, right?

William Frey:  I was part of the revolver.  I lent him half a million, quarter of a million at a pop, just send him over some money when he needed it.

Richard Pell:  There was originally—I think, I don't know, we were in for 3 million, my wife Lisa, and then QED a similar amount, I believe?

William Frey:  Yeah, something like that.

Richard Pell:  And so there would be draws, occasionally repayments of principle, occasionally payments of interest, and I think we went over the limit anyway, because we were told it was a short term thing.

Ben Higgins:  So, in addition to that, the equity funding you provided, you

also provided a revolving loan.

William Frey:  We were trying not to dilute the hell out of the shareholders.

Ben Higgins:  There's also significant claims listed for Kevin Johnson.  Can

you tell me about Kevin Johnson, the nature—?

Richard Pell:  He's another investor.

William Frey:  Yeah, see, unfortunately, when I was in the phase of still

believing in Kaiser and the business, I brought a number of friends in,

because I thought they had skillsets that at some point might be useful to

the company.  Kevin's a successful entrepreneur.  He built a software company

and eventually sold it to a public company Avnet.  But it was a very

successful enterprise.  I brought in other friends, Owen Blicksilver, who's a

PR expert.

Richard Pell:  I brought him.

William Frey:  John [PH 01:09:00] Minx who is a global facilities guy for

Jones Lang Lasalle.  We brought in a friend of ours who's a well-respected

lawyer in Connecticut.  I brought in a friend who's a private equity guy from

Los Angeles.  Unfortunately, when things started deteriorating, I was

personally very embarrassed about dragging some of these people in to an

unsuccessful and very deceptive operation, so I repurchased their shares at

great personal cost.  But Kevin Johnson, he was hired as an interim CEO when

Kaiser was terminated, and we had to give him some incentive to work in the

company, so we actually agreed to pay him I think it was $80,000 a month,

but, because we weren't confident we had any cash, we paid him $80,000 a

month in convertible debt.  Basically

43

in March of 2017 the company had raised capital mainly from my wife, but I think also from you, in an issue of convertible notes, 8.0% notes due in five years in 2022. So we agreed that Kevin would accrue an $80,000 face value interest in those notes on a monthly basis while he was working for us. And we used Kevin's services for approximately four months until that date when all the employees were let go and basically we decided we couldn't justify paying a fulltime interim CEO to oversee a workout process.

Ben Higgins: Just moving—that's the only questions I had regarding the actual creditors. You have a number of executory contracts, leases, so, as far as the real estate leases, you're no longer there, you're rejecting all those or will be moving forward, that's correct?

William Frey: Yeah. I think almost all the landlords, to my understanding, is they were happy to sign surrender agreements and nullify the leases, because they didn't want to get dragged into a protracted bankruptcy process. I think there's one exception to that.

Richard Pell: Two.

William Frey: Two.

Ben Higgins: And then this is a question that may be directed more towards your counsel, is there a reason that the homeowner agreements are not listed on the schedule as agreements that you intend to assume?

Richard Pell: The majority of the homeowner agreements have been assigned. There were apparently some agreements that were not assigned. We don't have them yet. We're trying to find them.

1  Ben Higgins:  And to the extent there are agreements that had not previously

2  been assigned and are property of the debtor or that the debtor is a party

3  to, is your intention to assume those agreements?

4  Richard Pell:  Absolutely, I think so.  No reason not to, they just generate

5  income.

6  William Frey:  They're just assets.

7  Ben Higgins:  And then how about the—there were a number of agreements, you

8  mentioned earlier that—agreements to install that Level Solar had never

9  actually gone forward with the install, would those, again, maybe more

10  towards counsel, would these be considered executory contracts?

11  Michael Conway:  Which ones now?

12  Ben Higgins:  The ones where the actual equipment hadn't been installed yet,

13  and agreements were signed.

14  Michael Conway:  Yeah, those—it's hard to qualify right now whether those are

15  executory contracts.  Bottom line is, if they turn out to be executory

16  contracts, I need to amend the schedule, I need to do it under seal, because,

17  if we're going to make those parties known publicly, then we're shooting

18  ourselves in the foot, so to the extent that we have to amend the schedule

19  and put those on as executory contracts, we believe that all those contracts

20  have been breached and that the extent that they exist, they existed in a

21  breached state.

22  Ben Higgins:  Breached by the debtor for not doing the installations?

23  Michael Conway:  No, breached by the homeowner for allowing somebody else to

24  come in and do the installation for them.

25

Ben Higgins:  Okay.  I think those are all the questions I had about the

schedules.  I had one or two questions about the statement of financial

affairs, which, for the record, is docket number 36.  So you currently list

revenue, since these schedules were filed, which was only I think a week ago,

from the petition date of $12 million, but that's—I want to make sure I

understand this correctly, that's not all revenue that's going directly to

the debtor, that's revenue—is that total revenue for all the—

Richard Pell:  This is from the first of 2017.

William Frey:  To the filing date.

Richard Pell:  To the filing date.

Ben Higgins:  Oh, okay.  I apologize.  I misread that.  So that is revenue

just that the debtor itself earned from that period of time.

Michael Conway:  That seems high to me.

Richard Pell:  That's what the financial records show that we have right now.

There were revenues, gross revenues of $12 million last year.

Ben Higgins:  For the entity that's just the debtor itself.

Richard Pell:  Just the debtor.

Ben Higgins:  Okay.

William Frey:  That's a number that would include the taxable profit Level

would have selling the array to one of these SPBs, that's not a cash flow.

Ben Higgins:  Okay, right.

William Frey:  There's a lot of money that goes all over the place that's in

notional form and is not actually money moving.

Ben Higgins:  Okay.

[01:15:00]

My one other question about the statement of financial affairs, on page 6, it's actually ECF page 7 of 19, it's where you list your various litigation, and there's a number of outstanding legal actions pending there. Could we run through those very quickly? Could you tell me about the [PH 01:15:24] Warnack case that's listed first there?

William Frey: Defer to Mike there.

Michael Conway: That was a New York Warnack case with New York plaintiffs filed just before we filed bankruptcy. There's been no movement. They're waiting to see where we're going to go next.

Ben Higgins: And are those plaintiffs, are they listed on the schedules as creditors or potential creditors?

Michael Conway: There's only one plaintiff, and he's listed as a notice party, and I think he was listed as an un-liquidated creditor, but at the very least as a noticed party.

Ben Higgins: Okay. You have Sonepar, that appears to be a concluded reclamation of goods.

Richard Pell: Sonepar is Coopers.

Ben Higgins: Coopers, okay, and they've already reclaimed whatever hard assets they had.

Richard Pell: Mm-hmm.

Michael Conway: They filed an action shortly before the petition, and it was resolved on the date that there was the first appearance.

Ben Higgins: Okay. There's two looks like issues with the landlord, I'm assuming, [PH 01:16:33] Grow Cash Realty Associates LLC, and those are both concluded at this point?

Michael Conway:  Right, they took the space back.  There were some issues

relating to a forced settlement agreement by the court that required us not

just to give the stakes back but to pay $10,000, so I believe that settlement

agreement for the 10 floor is going to be rejected.  There was a

[INDISCERNIBLE 01:17:02] 11 floor which I don't think is an issue.

Ben Higgins:  Okay.  Then there's a consumer fraud claim of Jeffrey Comeau,

it's C-O-M-E-A-U.  Could you tell me about that?

Michael Conway:  That was a case where the homeowner didn't know who was

going to be working on the systems going forward, because of Level Solar's

situation.  Once they realized that Sun Nation was coming in and taking over

management and maintenance of all the systems, that went away.

Ben Higgins:  Okay, so it's listed as pending, but it's no longer pending?

Michael Conway:  It's pending, but it's no longer, in our opinion, an issue.

It's just a homeowner asking for somebody to tell them who's going to take

care of my system.

Ben Higgins:  There's the New York State Department of Labor Investigation,

the Warnack Investigation.

Michael Conway:  And that's pending.  That's just a matter where they're

trying to get their arms around what the circumstances were of Level Solar

terminating their employees, and we're actually in communications as we

speak.

Ben Higgins:  Okay.  And then there's the worker's comp claim.

Richard Pell:  That's the guy who fell off the roof, right?

Michael Conway:  Yes, and that's really an action against the worker's comp

board, the trust fund where we're likely going to be held responsible in some

way if there was no worker's comp insurance in place, but that hasn't been established yet at the time of the fall whether there was or wasn't insurance in place. Again, that's something—it's an investigation that we've been exchanging information with them, giving them the employees wage information so they can calculate what was owed to the employee, and now they're trying to determine whether or not it's an insurance coverage issue or whether we're going to be asked to step up and self-insure.

Ben Higgins: And is that individual listed as a creditor in in the schedules?

Michael Conway: He is listed as a notice party, I believe. But he's paid in full, and he hasn't filed a claim against the debtor directly.

Richard Pell: I think we've picked up some medical [INDISCERNIBLE 01:19:20].

Michael Conway: Yeah, he was paid in full in terms of wages when he stopped working, and so to the extent that he becomes a creditor, he'll be something he determines when he files the claim. He's a noticed party now.

William Frey: It's remotely possible there could be a claim against the manufacturer of the safety harness that failed, I'm not sure.

Michael Conway: Right, but that's really—we may be [INDISCERNIBLE 01:19:47] if we have to self-insure. But we're not at that point yet.

Ben Higgins: You mentioned Sun Nation, and I realized I didn't ask about that earlier, but so Sun Nation is—one of you tell me about Sun Nation.

[01:20:00]

William Frey: Sun Nation is handling servicing, the maintenance, the O&M, it's called, operations and maintenance of the 2700 arrays, which means

they're fixing them, they're dealing with the customers, and they handle the bill, the ACH bill.

Ben Higgins:  And do you have a written agreement with Sun Nation as well?

William Frey:  We have a written agreement with Sun Nation.

Ben Higgins:  Was that a pre-petition agreement as well?

William Frey:  Yes, yes.

Ben Higgins:  Okay.

Richard Pell:  Is that at the debtor level or at the fund level?

William Frey:  Probably at the fund level.

Ben Higgins:  Okay.  Well, your counsel will talk to you guys if it is an obligation—if it is an agreement that the debtor is a party to, it might be something that would be added as something to assume, but we don't have to get into that at the moment.

William Frey:  I'm pretty sure it's at the fund level.

Ben Higgins:  Just a few more questions and then I'll open it up to creditors.

William Frey:  Except the 50 arrays or whatever that Level owns directly.

Ben Higgins:  Have you contemplated selling the business at all, selling the debtor?

William Frey:  Yes, but, until we get this sorted out, I don't see that there is any economic way to do that.

Ben Higgins:  Okay.  Outside of the debtor's ordinary course of business, were there any assets transferred to any other business or persons prior to the petition?

William Frey:  No.

```
 1  Ben Higgins:  Okay.

 2  William Frey:  Do you know of any?

 3  Ben Higgins:  Well, you have the allegations about Mr. Kaiser, but I'll—

 4  William Frey:  Aside from Kaiser taking money from the company and sending it

 5  to shell LLCs that he controlled.

 6  Richard Pell:  Do we know—is that true?

 7  William Frey:  Yeah.

 8  Ben Higgins:  Aside from those allegations, as far as you know, there weren't

 9  any transfers?

10  William Frey:  No, certainly not to the investors.

11  Michael Conway:  I think he's also just thinking in terms of general assets,

12  and, to answer those, not to our knowledge.

13  Ben Higgins:  Okay.  Have any pre-petition liabilities been paid since the

14  filing, other than the ones that you've obtained court authority to do?

15  William Frey:  Not that I know of.

16  Richard Pell:  I mean, we're paying Peg and—

17  William Frey:  Those are not pre-petition.  Nothing.

18  Ben Higgins:  Okay.  Has the debtor paid any bonuses since the filing of the

19  bankruptcy case?

20  William Frey:  No.

21  Ben Higgins:  Okay.  And you said yourselves you're not taking any salary.

22  William Frey:  Not taking any salary.

23  Ben Higgins:  Okay.  You've talked pretty extensively about what has to

24  happen to emerge from this case, so I won't belabor that, unless you want to

25  add anything to what you have to do to move forward.  My last point before I
```

open it up to any creditors is just to remind you.  I have to read this.  The

debtor must file monthly operating reports promptly each and every month, in

chapter 11, regardless of whether it is operating.  These monthly operating

reports must comply with the United States Trustee Guidelines.  The December

report is overdue, so that needs to be filed at some point.  There's also

quarterly fees that are due for each and every quarter that the debtor

remains in chapter 11.  Do you understand these requirements that I've just

read?  I'm happy to explain them more.

Michael Conway:  He understands it.

Richard Pell:  We understand it.  Working on the first monthly operating

report right now.

Ben Higgins:  Okay.  So the United States Trustee has completed questions of

the debtor at this time.  Are there any creditors of the debtor who have

questions at this time?  And could you please identify yourself and who you

represent for the record?

John Jureller:  Certainly.  It's John Jureller from Klestadt Winters, and I

represent Richard Kaiser.  And I just have a few questions regarding, excuse

me, the debtor's filings, including Mr. Pell's declaration, the schedules,

the statement of financial affairs.  Mr. Pell, in your declaration at

paragraph 14 you indicate that the debtor intends to, quote, ultimately

emerge from bankruptcy as the financing arm for other solar companies, which

will have responsibility for the sales, installation, and maintenance aspects

of the business.  Could you please update us on those plans?

Richard Pell:  Yeah, I think that was correct as of the time of the filing.

As I mentioned earlier, this is a very fluid situation with respect to the

U.S. tax code and recently some things have happened in the industry. Trump
put a 30% tax on imported solar panels. We think actually the industry will
survive that. But more challenging is the reduction in the overall corporate
tax rate, so there was a whole industry out there supplying tax equity to
finance alternative energy, not just solar but wind

[01:25:00]

projects as well. The problem is, with the drop in the tax rate from 35% to I
think it's 21%, there's an overabundance of need from solar companies but a
sudden huge shrinkage in the supply, so key players in the industry, U.S.
Bank Corp's a huge player, Goldman Sachs, J.P. Morgan, but they also have
other ways of generating investment tax credits. A big one is low and middle
income housing projects. So that takes up a lot of their capacity, and then
the overage that existed at 35% was available for projects like solar and
wind. That suddenly disappeared. So it seems to us quite possible that
players like USB, Goldman, J.P. Morgan and other players will exit the
business entirely, which means the whole viability of a company that plans to
leverage our financing capability to develop complicated structures and so
forth, if we can't get tax equity, that kind of goes out the window.

John Jureller: So you've been in bankruptcy for two months now. Do you have
anything in place with respect to emerging as a new company?

William Frey: No.

John Jureller: Okay. Has there been any financing secured or negotiated
with respect to a potential new company, reorganized company?

William Frey: No. We'll deal with that when we get past the crap your
client left behind.

Richard Pell:  Yeah, this is my first bankruptcy, so it's a learning

experience.

John Jureller:  Have you identified any management with respect to a possible

new company, any interviews or any discussions with anybody who would be

involved?

Richard Pell:  Nothing formal.  As we brainstorm occasionally about this as a

possibility, people come to mind, but we haven't had formal discussions with

anybody.

John Jureller:  Have you set any time period as to when you're going to make

a decision as to how the company's going to reorganize?

William Frey:  No, and, even if we do it, we don't necessarily have to do it

under the Level umbrella.  We can set up another seed corp and do it out of

that.

John Jureller:  Okay, well, I'm asking about the debtor and what the debtor's

planning to do, and I'm quoting what you state in your declaration, so that's

understood.

Richard Pell:  Yeah, it's a fluid situation.  I mean, your choice I guess in

bankruptcy is, what, chapter 11 or chapter 7, and, while we still have plans

and hopes and I think we still do to emerge as an entity, 11 seems the more

appropriate format rather than going to a liquidation process under chapter

7.

John Jureller:  Excuse me, on your scheduled assets, which is docket number

35, as we talked about, you identify certain causes of action against, quote,

Richard Kaiser, former employees and other third parties.  You've identified

the potential claims against the formal employees.  You also identified as to

the third party in that quote as being U.S. Bank. What is the claim that you

have against U.S. Bank?

William Frey: It burned 1,000 arrays to the ground by not funding them, not

selling them, taking over as managing member and ignoring those assets.

John Jureller: Do you have any demands against U.S. Bank related to those

claims?

William Frey: No, not yet.

John Jureller: Just let me finish, just because we're on the tape recorder.

With respect to Mr. Kaiser, what's the basis of any potential causes of

action against him as identified in the assets, the scheduled assets?

William Frey: Theft, he's committed security fraud. He's stolen money. He

wired money to himself from the company. He misrepresented the financials

and took investors' money based on that. Gross mismanagement, that's the

least of the problems. But he's basically a sociopath and a pathological

liar.

John Jureller: Counsel, I don't know if that's necessary, but I'll let you

talk to your client.

William Frey: That's toned down.

John Jureller: What is the securities fraud that you allege?

William Frey: Well, if you tell someone X and it's Y and you take their

money, that's called securities fraud.

Richard Pell: It's a 10B5.

William Frey: It's a 10B5 violation. Also, if you omit material information

and take peoples' money, that's a 10B5 violation.

John Jureller: Have you taken any action yet with respect to these claims?

```
 1   William Frey:  No.

 2   John Jureller:  You indicated that he wired funds to LLCs that he controlled.

 3   When did he wire these funds?

 4   William Frey:  Many times.

 5   John Jureller:  When?

 6   William Frey:  I don't have the schedule.

 7   John Jureller:  How did you identify the dates that he had wired those?

 8   William Frey:  Because we found the wires when we were doing the forensics,

 9   when we were going through it.  One of the problems is he didn't keep any

10   books and records.  He

11   [01:30:00]

12   stopped keeping all books and records over a year ago.

13   John Jureller:  And what were the LLCs that he reportedly wired funds to?

14   William Frey:  One that we know about is Kaiser Analytics, which is an LLC

15   controlled by him.  We also have wires directly to him and Scott, and there's

16   lots of other wires that we have not yet figured out.

17   John Jureller:  And Scott is the controller that we couldn't pronounce his

18   name.

19   William Frey:  He was in cahoots with Kaiser.  I hope you have a criminal

20   defense.

21   Michael Conway:  They do.  Their firm actually is very good on the criminal

22   side.

23   William Frey:  Good, you're going to be busy.

24   John Jureller:  How did you calculate the alleged damage of 35 million?

25   William Frey:  Of Kaiser?
```

John Jureller:  You set forth in your schedules that the causative actions have a value of not less than 35 million.  I'm wondering how you calculated 35 million.

William Frey:  I don't know.  But, if you look at the value of what Kaiser did, he destroyed—

John Jureller:  Well, if you don't know, maybe Mr. Pell knows, since he's the one who signed it.

Richard Pell:  Sure.  Which page are we on?

Ben Higgins:  It would be in your schedule A/B, and it's page, at the bottom of the page, page 9.

John Jureller:  It says 9, but it's actually 8 of 46.

Richard Pell:  Page 9, okay.  This says against Richard Kaiser, former employees, and other third parties, 35 million.  That number's probably low, but that would include Richard Kaiser, U.S. Bank Corp., Richard Kaiser's law firm, the accountants to the company, which gave us an unqualified audit opinion.  So there are a variety of people we intend to pursue.  Kaiser's just one of them.

John Jureller:  How do you calculate your claims against Mr. Kaiser?  Do you have a number?

William Frey:  If it were completely up to me, I would take the value of Level today versus the value of Level when you were raising capital, and the number would be substantial in the triple digit numbers.

John Jureller:  But you put in a number in the schedules, and I'm just asking how you came up with that number.  If we stick to my questions, then we can get it done.

Richard Pell:  Well, first, you have to understand that we're hiring a forensic accountant, so we're dealing with a situation almost made of like where new moneys, new suckers, new sources of capital had to be constantly sought to plug a black hole of where the money went.  We're still trying to put that together.

John Jureller:  So at this point you have not retained a forensic accountant.

Richard Pell:  We've come up with some names.  It's just a question of when's the appropriate time to start the work.  So what we have now is actually a very able bookkeeper, Peg [PH 01:33:06] Finkle who was used by Kevin Johnson's prior company, Seamless Technologies, which was sold to Avnet. She's in there sorting through the records, as she finds them, bank statements and so forth, as she's able to get her hands on them.  So we're at the very early stages of figuring out where exactly all the money went.

John Jureller:  So the claims that you've asserted in your schedules were found by this bookkeeper, [INDISCERNIBLE 01:33:34] the bookkeeper?

Richard Pell:  Yeah, I mean, and if just off the top of your head you think about numbers, I think roughly 30 million went in in terms of equity and debt financing into this black hole based on fraudulent information compiled by Mr. Kaiser.

Michael Conway:  The majority of that number comes from the lost value of the arrays.

Richard Pell:  Yeah, I figure, I mean, it's—

John Jureller:  Which is what was the claim against the U.S. Bank, correct?

William Frey:  We have not made a claim against U.S. Bank yet.

```
 1  Richard Pell:  It's not a claim against U.S. Bank.  There's no claim against

 2  U.S. Bank.  Mr. Frey has indicated previously that he's referring to somebody

 3  else and using that term, because it's easier for him to use, but right now

 4  that number doesn't include anything relating to U.S. Bank or First Star or

 5  anybody else.  It relates to the parties that are related to the burning down

 6  or stealing of assets from the company, the breach of fiduciary duties by Mr.

 7  Kaiser, the extent that there are other claims that are pursued which are not

 8  included in that, I'm sure that we'll find them, and to the extent that there

 9  are claims against First Star, they haven't been found yet, but, if they are

10  found, we will pursue them, but that number relates to the

11  [01:35:00]

12  employees taking assets from the company and taking them to their new

13  employers, Mr. Kaiser burning the equity to the ground by simply mismanaging

14  the company and committing various acts of fraudulent misrepresentation and

15  essentially hiding his acts in various ways from the owners of the company,

16  and $35 million is essentially the value that was lost by those acts.  It has

17  nothing to do with other possible claims that we might locate down the road,

18  and I'm sure we'll locate a lot of claims down the road.  It could include

19  malpractice by accountants or attorneys or by other parties that are involved

20  in this business, but this is related to the assets, the value of the

21  business that was lost and the assets which were lost based on the actions of

22  Mr. Kaiser and the former employees and the parties they employed, the former

23  employees.

24  John Jureller:  When you indicate the lost value of the arrays, could you

25  quantify that, how you come up with that?
```

Richard Pell:  It's actually pretty complicated to figure out the value of an

array.  There are a whole bunch of pieces that go into that, so they've got

arrays of all different size.  You've got them in different locations.  The

further south they are, the more sun that gets produced, the further north

they are the less sun that gets produced.  Then by location of the asset,

there are different state and local incentives for green energy.  You know,

earlier it was mentioned the SREC program in Massachusetts.  They don't have

an SREC program in New York.  Another factor is, okay, these things are 20

year power purchase agreements.  So you think about it as an annuity, I've

been in a little bit of a bad mood this week, because I've noticed interest

rates are going up, and, when interest rates go up, the present value of

those annuity cash flows goes down.  So it's kind of a moving target.

John Jureller:  And how do you define, what's your definition of the lost

value of an array?  I mean, how do you come up with that?  When you say when

somebody lost the value of an array, what do you mean by that?  Are you

talking about a contract that wasn't signed or a contract that was signed and

never completed or what—?

Richard Pell:  There are different categories.  I guess you're more familiar

with this, Bill, but in some cases a contract was signed and the stuff was

not installed.  In a number of those cases, the salesman who made the sale

went over to a competitor.  There's one in particular where a lot of them

went, and the sale was consummated, even though they had non-compete

provisions.

John Jureller:  But as it relates to Mr. Kaiser, how would he be involved in

the lost value of an array?  Because you're taking former employees that went

to other companies, not Mr. Kaiswer.  How do you define that for Mr. Kaiser?

Richard Pell:  It's not primarily lost value of the array that Kaiser was

responsible for.

John Jureller:  No, that particular aspect of your alleged cause of action,

how does that relate to Mr. Kaiser?

Richard Pell:  The lost value of the array typically the cause of action

would be against the employee who took the asset.

William Frey:  Mr. Kaiser also took a lot of intellectual property from what

we believe he took.

Richard Pell:  Well, we understand that he may have been accessing our

systems after he was terminated, but that's, again, for the forensic

accountants to put together, plus technology experts.

John Jureller:  In the debtor's statement of financial affairs, which is

docket number 36, you list—and this is payments to insiders, a payment of

$500,616.44 to Mr. Kaiser on January 6, 2017, identified as unknown, quote,

unquote, unknown.  Are you aware that on December 22nd, 2016, three weeks

before this payment, Mr. Kaiser loaned the company $500,000 to cover payroll?

Richard Pell:  Yes.

John Jureller:  Okay.

William Frey:  We had the right to get that money back.

John Jureller:  And, if you knew that that was a loan to cover payroll, why

did you identify it as unknown?  Why didn't you identify it as a loan?

Richard Pell:  Sorry, maybe that needs to be corrected.  But, at that point,

when he lends the company $500,000, there were other secured creditors,

including QED, Bill's financial vehicle, including my wife who had lent the

company $3 million.  Kaiser didn't consult us before he put the money in.  We

would have periodic discussions about the cash flow needs of the company.

Typically it would look great, and then suddenly there'd be a desperate need

for

[01:40:00]

cash, and oh my god, we need this by next week.  But we weren't consulted

before he put that money into the company, nor were we consulted before he

took it out, even though at that point he would have ranked pari-passu with

all the other unsecured—

John Jureller:  Do you know whether Mr. Kaiser gave notice of the loan to and

received the approval of the board?

William Frey:  I do not believe he did.

John Jureller:  Do you know for certain whether he did or not?

William Frey:  I would be 99.99% certain he did not, but I'm not on the

board.

John Jureller:  And, if he did not put in the funds, is it then true that the

company would not have been able to make payroll for December in 2016?

William Frey:  I don't know.  That may have been a very good thing, by the

way.

Richard Pell:  It would have prompted a discussion with his other board

member and the key shareholders, that's for sure.

1  John Jureller:  In your declaration, Mr. Pell, you state under oath that, in

2  paragraph 11, that Mr. Kaiser, quote, used millions of dollars in new

3  investment funds to pay himself.  Again, do you have certain dates when that

4  actually occurred, dates and amounts?

5  Richard Pell:  A million dollars.  Yeah, I was referring to a million dollar

6  purchase of stock directly from Richard, so I've got to get the date on that

7  transaction, but, as part of an equity raise, Richard made the argument,

8  look, I'm working for a few hundred thousand dollars a year or something, I

9  have no real serious money.  I need a million bucks.  So at that point we

10 were still very bullish on the prospects for the company based on the false

11 information in repeated presentations we got from Mr. Kaiser, so he took a

12 million dollars from my wife in exchange for securities, which he later

13 acknowledged were greatly inflated in value.  And, when confronted by that,

14 he agreed that actually the valuation applied to the company was a lot lower,

15 and therefore he actually should have given up a bigger part of his equity

16 interest, and the transaction was adjusted in her favor.

17 John Jureller:  So, just to be clear, this was a million dollars, this

18 statement that was in your declaration relates to this million dollar private

19 stock purchase, that's it.

20 Richard Pell:  Correct.

21 Michael Conway:  No, not necessarily.  He's asking you for a qualifying

22 answer, something that's inappropriate at this point in time, but there are

23 other—you already raised the point yourself, counsel, that he took in 2017

24 $500,000, he got that from a deposit that was made of $2 million and new

25 money raised.  Instead of using it for the company, he used it to pay

himself.  There are other examples of this, so please don't turn this into a

deposition and a lawsuit.  That's not why we're here.

John Jureller:  And I'm not, and I'm asking Mr. Pell, and you can answer—

Michael Conway:  I'm sitting here listening, and I'm counsel.

John Jureller:  It was a simple question whether it was from a stock raise,

and he said that it was, and that's all that I'm asking.

Michael Conway:  Yeah, and you know why we're here.  This is a 341 meeting.

This is not a lawsuit.

John Jureller:  Understood.  And I'm asking questions that are set forth in

declarations under oath, and Mr. Pell has answered the way that he answered.

Again, Mr. Pell, in your declaration at paragraph 12, you state that Mr.

Kaiser obtained approximately 5 million of inventory funding without

informing the board of directors, correct?

Richard Pell:  Yeah, that was his—

John Jureller:  When did he do that?

Richard Pell:  Dates, I think it was in 2016.  That was his arrangement with

Coopers after LG had terminated our 90 day financing terms, I think probably

due to poor payment record on our part.

John Jureller:  Who were the members of the board of directors at that time?

Richard Pell:  It was a two person board.  Richard Kaiser had two votes.

Carrie Frey had one vote.

William Frey:  He thought he had two votes.  The document you signed he had

two votes, the document I signed he had one vote, I never signed your

document, as far as I know.  Mr. Kaiser had this problem of forging documents

as well.  I hope you have a really good criminal defense.

John Jureller:  I don't know whether, again, counsel, these statements are completely unnecessary and inappropriate.

William Frey:  He's going to get a lot more than that.

John Jureller:  With respect to—isn't it true that on February 24th, 2018, Mr. Kaiser actually e-mailed a 20-page board presentation to Mr. Pell, yourself, Carrie Frey and Kevin Johnson and company corporate counsel that indicated and showed the changes in inventory?

Richard Pell:  In 2017?

John Jureller:  2017, yes.

Richard Pell:  I don't have that in front of me.  I can't recall.  There have been so many presentations over the years.

John Jureller:  Do you recall receiving a 20-page presentation in February 2017?

[01:45:00]

Richard Pell:  I can't identify that one specifically, because I've received many 20, 30, 40 page presentations from Richard Kaiser, which are all being dissected as we speak.

John Jureller:  And you don't recall whether that presentation had—or the presentations you received at that time period had changes in inventory in the terms?

Richard Pell:  Changes in inventory?  I mean, I actually—at the time the deal with Coopers was announced, I heard about it.  At that point I thought it was pretty clever actually, because we were a cash-constrained company.  We had some sources of debt financing, chiefly the New York Green Bank.  The removal of credit terms from our leading supplier of solar panels was a problem.  My

initial reaction was Kaiser did a pretty good job of negotiating that deal,

but—

William Frey:  What was represented to me was that Coopers was willing to

give 90 days when others were giving 60 or giving 120, when others were

giving 90.  The reality was that it was—much of this debt was the better part

of a year.

John Jureller:  But do you have any recollection, and obviously the

presentations will show, that these inventory terms were actually in the

presentations to the board?

Richard Pell:  I'd have to look at the document.  It's not in front of me.

John Jureller:  But, as we said, you don't know either way.

Richard Pell:  It's quite possible.  I mean, he certainly did disclose it at

some point.  I think it was post-agreement rather than pre-agreement.

John Jureller:  Okay.  Do you know when the agreement was?

Richard Pell:  No.  I mean, we heard about it as a fair accompli.  It wasn't

something that was discussed with the board.

John Jureller:  Do you know whether it was in the board presentations from

March, April, and May of 2017?

Richard Pell:  I'd have to have the documents in front of me with the dates.

John Jureller:  Who would have received the board presentations?

Richard Pell:  Typically it was a pretty small group.  The key shareholder

Bill owns the majority of the company.  His wife co-owns it with him. I own

somewhere between 15 and 20% of the company.  I would typically get one.

Kevin Johnson later became more involved with the business and took a decent

amount of the stock.  I forget how much.  Then occasionally we would have a

consultant present.  We were advised a lot by a gentleman, [PH 01:47:27]

Brian Bernhart, who's pretty knowledgeable about the solar industry, and we

used him as a consultant.  And then often Scott would be present, because he

would prepare a lot of the spread sheets at Richard's direction.

John Jureller:  So, when you state that the board of directors were not

informed, that's actually not correct, correct?

Richard Pell:  Your question was we were not—

John Jureller:  I'm not asking you.

Richard Pell:  Were not informed before the transaction with Coopers was

negotiated.  So we might have been informed as a fait accompli.  I think we

were informed after the fact.

William Frey:  And we certainly did not understand the magnitude of it and

the fact that it was effectively debt financing.

Richard Pell:  We thought it was a clever way of reducing our working capital

needs by negotiating a good inventory management system.

John Jureller:  Sorry.  Mr. Kaiser's counsel has written letters to the

debtor's counsel and filed these letters with the court referencing

documentary evidence in the debtor's possession that statements in your

declaration are actually not accurate, including, with respect to the

worker's comp insurance, the inventory and the alleged alteration of the

corporate governance documents.  Have you been able to locate, excuse me, any

e-mails or other documents referenced in these letters?

Richard Pell:  Defer to counsel on what sort of paper trail do we have on the

alteration of the investor rights agreement?

1  Michael Conway:  I haven't looked at that in a while, but there's certainly a

2  paper trail, but it's not relevant to this process today.

3  John Jureller:  Have you looked at any of the claims that were in the letter

4  or done any investigation on that?  And, Mr. Pell, I'm asking you, because

5  it's your declaration.

6  Richard Pell:  Yeah, but it's your letter.  So the letter came after the

7  declaration.

8  John Jureller:  Understood, but the letter—so the declaration—

9  Richard Pell:  I'm not sure what this has to do with a bankruptcy proceeding.

10  John Jureller:  Well, because you're filing documents in support of the

11  bankruptcy filing, and we've provided information in the letter which shows

12  that some of that information is not accurate, and I'm asking whether you

13  looked into it after you received our letter.

14  Michael Conway:  That would be confidential information.  You're asking him

15  whether he's had conversations with his counsel about these things.  You sent

16  a letter

17  [01:50:00]

18  to counsel.  And you want him to now tell you what counsel has done to look

19  into that?

20  John Jureller:  I'm just asking whether he looked into it or not.

21  Richard Pell:  Well, honestly it's going to be a process of seeking payment

22  for the creditors of Level Solar Inc.  I would include us in that, but also

23  other people perhaps in the room.  There are various avenues we're going to

24  pursue.  One of them is Mr. Kaiser, actually every asset he has, and for us

25

to lay forth our strategy, how we're going to recover assets and drive him

into bankruptcy just doesn't seem timely.

John Jureller:  So, again, my question is have you done any investigation

with respect to the allegations in the letter?  It's just a yes or no.

Michael Conway:  His counsel certainly has and determined everything in the

letter was false.

John Jureller:  Okay.  I have nothing further.  I'm going to reserve all

rights on behalf of Mr. Kaiser with respect to a rule 2004 exam if we deem

appropriate.

Ben Higgins:  Thank you, Mr. Jureller.  Would anyone else like to ask some

questions over there?  Could you please identify yourself and the party that

you represent for the record?

Arthur Rosenberg:  Of course, thank you, yes.  My name is Arthur Rosenberg.

I'm with Holland & Knight.  We are counsel for the New York Green Bank, which

has been mentioned several times during this meeting.  We just had a few

questions to follow up, primarily on the schedules and to a smaller extent on

the statement of financial affairs.  I can certainly talk about sections of

the schedules.  But the first thing I just wanted to talk about is 3.1, item

3.1, which are the bank accounts.  I guess now, based on what you told us,

there's really only one remaining bank account, which is the checking account

or the operating account number 42 70.  Could you tell us what the background

was, the background documents to come up with the $714,000 number?  Do you

guys see the statement from Citibank?

Richard Pell:  That's the number that was on the online summary of the

account at the time this was done.

Arthur Rosenberg:  And do you have any bank statements going back at least

through the bankruptcy filing and before?

Richard Pell:  We do now.  We're in the process of trying to get them.  But,

as I mentioned to you in the past, we'll certainly get you copies of all of

the—

Arthur Rosenberg:  That was my follow up question, could you get us copies

just so that we have a little more transparency on those bank accounts?

Okay, good.  When you filed, when debtor filed the cash management motion,

remember there was a schedule attached that listed several other bank

accounts, 12 of them or some number like that, right, if you recall that?

Obviously two of those accounts are listed under schedules.  Did you locate

any assets in any of these other accounts?

Richard Pell:  Any amounts that were in any accounts were transferred to the

operating account.

Arthur Rosenberg:  I see, they all were converged into the operating account.

Do you have statements for any of these other accounts?

Richard Pell:  As far as I know, we either have or are getting statements for

all accounts that like I said are now closed, but we'll have statements

through the closing, and it'll show what moneys went where.

Arthur Rosenberg:  Right.  And do you know whether any customer payments, the

ACHs, as we call them, although I know there are some checks, do you know if

any of those payments went into the other accounts?

Richard Pell:  We don't know the source of these payments yet.

Arthur Rosenberg:  You don't know the source yet, okay.  Do you know the

source of some of the payments into the 42 70?  Are there some customer

payments in that account?

Richard Pell:  We're not aware of what the source is of anything pre-petition

yet.  There's been no—well, take that back.  I think there may be a few

hundred dollars of post-petition customer payments in that account, and I

have requested copies of those checks, because we're trying to determine

whether those are the debtor's money or whether they belong to the funds.

Arthur Rosenberg:  To the funds, okay.  So you anticipate being able to get

bank statements from the pre-petition period.

Richard Pell:  Correct.

Arthur Rosenberg:  Okay.  That's fine.

Richard Pell:  And, with luck, we'll be at the customer level, be able to

figure out what went where, but it's a process.

Arthur Rosenberg:  Timeline-wise you think a couple of weeks, a month?

Richard Pell:  Maybe.  We're hopeful.  We're hopeful.  It's been slow getting

information, but we're getting there.  We feel like we're pretty close now.

Arthur Rosenberg:  All right, thank you.  Next, let's see, item 11B and 12,

which I guess is the 31 million, that's for the—I think that's listed as

receivables.

[01:55:00]

Did you say that that was ACH's debt or customer payments that are due or is

that the capitalized value?  It was unclear to me what you guys answered.

Richard Pell:  Yeah.  That's a number that is in the—

Arthur Rosenberg:  You know which one I'm talking about.

Richard Pell:  I know the number.  It's the number that comes from the

balance sheet of the company that is based upon the books as they've been

able to be reconciled to date, and it includes ACH transfers that are due and

residual amounts that are due, tax credits that are due.  So that number

could include moneys that should be ultimately up streamed or down streamed,

however you want to put it.

Arthur Rosenberg:  Right, but at the moment that's still—there's not enough

transparency there yet.

Richard Pell:  Exactly.

Arthur Rosenberg:  But you anticipate getting more transparency on that?

Richard Pell:  We do.

Arthur Rosenberg:  Okay, good.  Secondly or thirdly, sorry, let's see, 15.1

and 15.2.  Oh, the valuations of the two subsidiaries that you list, 15.1 and

15.2 on schedule A are the valuations of the two subsidiaries that you list.

Do you know how those work?  Well, I guess the first one says it was book

value.

Richard Pell:  That's what was invested by essentially two people sitting

here put that much money into it.

Arthur Rosenberg:  I see, and not you.

Richard Pell:  Not me.

Arthur Rosenberg:  Okay, got it.  So those were invested into Level Solar

Master Holdings, and then the estimate of the value of Level Solar fund two,

do you know how that was estimated?

Richard Pell:  Yes.

William Frey:  That's the Henry Howard one, right?

Richard Pell:  Fund two is not—that's Level Solar.

William Frey:  Two is Level Solar.

Richard Pell:  That's based on the value of the assets in Level Solar at $5.00 a kilowatt, the tax credits that have already been taken multiplied by the number of arrays.

Arthur Rosenberg:  So that was done by, $5.00 a watt, so that was done by determining a cash flow based on—

Richard Pell:  It's an estimate of fair market value.

Arthur Rosenberg:  And that would be the value of arrays owned by that entity, that fund.  Okay, I see.  And, right, the arrays are not based on hardware.  They're based really on cash flow or electrical flow I guess is what Mr. Frey just said.  That makes sense.  Okay.  Let me see.  All right, this one—skip this one.  Item 77, let's look at item 77.  Oh, you touched on this a little bit.  Item 77 part 11 of the schedules, I think that's all schedule A is a $9.8 million figure that's called capitalized solar arrays. Do we know which arrays that was?  I know it was not 100% clear from the answer earlier.

Richard Pell:  Bill, did you work on this?

William Frey:  A lot of this information came from the audit, which we're not sure we can put 100% faith in.  This comes from the balance sheet that was created by an auditing company.

Arthur Rosenberg:  Right, because someone had asked if it was the 50 arrays on the roof.  I think the answer was that would be much more than what those are worth.  Is that the residual on the back end of all of the 2700 arrays?

Richard Pell:  It could possibly be the residual, I don't know.

Arthur Rosenberg:  But you guys—it was in the audit, but you're not 100%
certain.

William Frey:  So we sell 20 year PPAs, and New York Green Bank has a claim
on it, and it's probably going to take, I don't know, 5, 6, 7, 8 years for
the Green Bank to get repaid, so that might be a figure that's putting a
valuation on the very back end.

Arthur Rosenberg:  The residual is what I would call them.  You guys call it
the back end, got it.  Yeah, if you could follow up on that, I know this will
be continued, as Mr. Higgins said, and if we can just get an answer on it,
just to make sure all of our—

William Frey:  That number smells about right.

Arthur Rosenberg:  I mean, that's what I would think, but you guys know the
numbers certainly much better than I do, so, okay, fine.  And let me see.
Oh, the consignment agreement that's referred to in item 2.1 of schedule D, I
guess that's with Cooper Friedman or something like that, right?

Richard Pell:  Yeah, that's the people who were supplying our panels and
providing financing that we were discussing earlier.

Arthur Rosenberg:  Now, are Cooper Friedman and Cooper Electric Supply
related companies?  They are?

Richard Pell:  Yes.

Arthur Rosenberg:  Okay.

William Frey:  The name is Cooper Friedman Electric Supply.

Arthur Rosenberg:  It is, yeah, and I saw that, but Cooper Friedman is
located somewhere out in New Jersey.  Cooper Electric was like Hicksville,

New York.  I just wanted to make sure we're talking—that's probably two sides

of the same—

Richard Pell:  They own a lot of companies.

Arthur Rosenberg:  They own a lot of companies, and—

Richard Pell:  Ultimately it's owned by a French parent.

[02:00:00]

Arthur Rosenberg:  Oh, really?

William Frey:  Yeah, it's a French private company.

Arthur Rosenberg:  Is it Cooper or Friedman?  I withdraw that question.  It

doesn't sound French.  Cooper, do you anticipate any liability as a result of

the consignment arrangement?

Richard Pell:  He owns $45 million.

Arthur Rosenberg:  That's the other side of the arrangement though, right?

There's really two sides.  There's consignment and then—or are they all one

and the same?

William Frey:  It's all wrapped up in one and the same.  Consignment was of

those panels that they claimed the $4.5 million.

Richard Pell:  We've been making the best efforts to get them their panels

and equipment back.

Arthur Rosenberg:  It wasn't clear to me that they were the same transaction,

but it sounds like they were.

William Frey:  They have a security interest in the panels, the panels, or

what they claimed, the $4.5 million.

Arthur Rosenberg:  Got it, okay.  Now I understand that.  Let's see, this one

was answered already.  Oh, you mentioned—one of you mentioned, I'm sorry,

that at one point the homeowner agreements were assigned. I forget which one
of you guys said that. When you said the homeowner agreements were assigned,
generally did you mean they were assigned to the funds or was there another
third party?

Richard Pell: Funds.

Arthur Rosenberg: To the funds, okay, that's what I thought, but that wasn't
clear. And then, let me see, item 21 of the statement of financial affairs,
so let's jump over to the statement of financial affairs, which is docket
number 36, and item 21 I believe that says the question is list any property
that the debtor holds or controls for another entity. Now, when that was
determined, did you consider the possibility that there was some money within
the bank accounts that may belong to the funds?

Richard Pell: Obviously not, because I think it says none.

Arthur Rosenberg: Yeah, it says none, but you anticipate it's a possibility
that some of the money in the checking accounts, without asking for an
admission, that some of the money in the checking account may belong to third
parties, most likely the funds?

William Frey: Based on our conversations with you or my conversations with
you, that's what you've told us, so we intend to fully investigate.

Arthur Rosenberg: So you're going to investigate that possibility, and, if
that's not correct, you may amend the schedules or the statement accordingly
maybe.

William Frey: Right.

Arthur Rosenberg: Okay. Let's see. I don't think I had any other
questions. A bunch of them have been answered already either by your answers

to Mr. Higgins or to Mr. Kaiser's counsel. So I think I'm all done. Thank you very much, gentlemen.

Ben Higgins: Thank you, Mr. Rosenberg. Anybody else? Okay. I did have one follow up question for you, then we can get out of here. You mentioned that there was a lot of effort going into the structure of the financing and that's actually almost the expertise of the debtor at this point is actually setting up this arrangement, and you described some of the subsidiary entities as bankruptcy remote entities. So I mean this structure was intentionally set up to minimize the risk of the actual cash flow from the debtor's creditors, is that correct?

William Frey: That's correct.

Ben Higgins: Okay. That's my only question. There's a few issues that are outstanding, the DIP account is one, and there are a couple potential amendments. So what we'll do is we will continue this to a further date. How much time do you think you need to get some of that stuff worked out?

William Frey: DIP account should be done in a few days. You know, with the financial information that we may or may not modify and the schedules, we're on the verge of having all of the data finally delivered to us and organized by the book. Once she has organized all the data and we have all the data, that's when we're going to hand it to a forensic accountant who will then dive deeper and find out what if anything we missed and got wrong or just didn't see. At that point, I assume the questions like Mr. Rosenberg's which are a little more of a deep dive question, you know, is there any money, for instance, in the operating account that was being held for the benefit of somebody else, those are the questions that you really need to have a real

deep dive into this stuff to figure out.  With respect to the other questions

that we said, you know, might result in changes, we're talking about

valuations.  You know, those estimates or valuations change as we get more

data.  I'm not sure that we're going to give you definitive

[02:05:00]

answers to the value of the assets in this case, because they're not

tangible.  So we may be revising that throughout the case.

Ben Higgins:  Right, and that's not necessarily something that you need a

definitive answer for the purposes of the 341 meeting, but it seems like

there's enough open questions right now where it makes sense to kick this out

a little bit till you have some more information and then we can decide if we

need to come back here.

William Frey:  I would say if we kick it out to the middle of March and then

decide whether or not we need more time, I can tell you this.  Right now I'm

in trial, and I'll be in trial till the end of February, and the trial's in

Maryland, so I'm not easily accessible, but mid-March I'll be back in the

saddle.

Richard Pell:  It's tricky, because, you know, we have an interest in having

enough time to do a thorough job putting the information together.  The flip

side of it is we're big creditors of the company, so we're also impatient,

because we wouldn't mind doing our best job to get our money back.

William Frey:  It's also, just from an opportunity cost point of view in

life, this is all negative energy.  It's just a pain in the ass, a learning

experience, but a pain in the ass.

Ben Higgins:  Yeah, well, maybe we could remove some of the negative energy by not keeping it too far out.  Mid-March you suggest, is March 9th soon or far enough out?  Or how does that work?  Fridays are generally the day that I know we have availability here, so that's why I'm picking it.  If it's better for the parties, we can do earlier in the day.  We don't have to do the afternoon.

Richard Pell:  We'd be able to tell you, but they took our phones.

Ben Higgins:  Sorry about that.

William Frey:  March 9th is actually a bad day, but the 16th is a good day.

Ben Higgins:  Okay, March 16th.

Richard Pell:  16th is better for me, actually.  March 9th I might be in Los Angeles, but March 16th I should be here.

Ben Higgins:  Okay.  Well, is the afternoon or the morning preferable?

Richard Pell:  Afternoons always for me.  But I'll be flexible based on other peoples—

Ben Higgins:  We'll do March 16th at 2:30 P.M. again.  I don't anticipate having to have another meeting after that, so hopefully as much information as you can have based on you know what's come up and what's not been answered.  I'll also try to put a list together of anything that the U.S. Trustee needs by that point, and I'm sure we'll be in contact about other issues in the case as well.  I saw you have a sale motion scheduled for later in February.  So I believe the meeting is not closed, but we're done for the day.  Thank you.