**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

| | |
|---|---|
| In re: | Case No.: 17-13469 (RG) |
| LEVEL SOLAR INC.,[1] | Chapter 11 |
| Debtor. | |

-------------------------------------------------------------------x

**DISCLOSURE STATEMENT FOR SECOND AMENDED
JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF CHAPTER 11 TRUSTEE AND PELL-QED PROPONENTS**

SilvermanAcampora LLP
Anthony C. Acampora
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
Tel: (516) 479-6300
Fax: (516) 937-7002
AAcampora@SilvermanAcampora.com

Counsel for Ronald J. Friedman, Esq.
Chapter 11 Trustee

Wollmuth Maher & Deutsch LLP
Paul R. DeFilippo
Brad J. Axelrod
500 Fifth Avenue
New York, New York 10110
Tel: (212) 382-3300
Fax: (212) 382-0050
pdefilippo@wmd-law.com
baxelrod@wmd-law.com

Counsel for Lisa V. Pell and QED, LLC

---

[1] Federal Tax Id. No. xx-xxx 0893

## <u>TABLE OF CONTENTS</u>

ARTICLE I.  INTRODUCTION AND OVERVIEW ................................................................. 1

    A.   *General.* ........................................................................................................... 1

    B.   *Purpose of Disclosure Statement.* ................................................................. 1

    C.   *Brief Explanation of Chapter 11.* .................................................................. 4

    D.   *Confirmation and Consummation of the Plan.* ............................................. 5

    E.   *Risk Factors.* .................................................................................................. 5

    F.   *Brief Overview of the Debtor and the Plan.* .................................................. 5

        1.   Summary of the Plan. ....................................................................... 5

        2.   Reasons for the Chapter 11 Filings. ................................................ 6

    G.   *Summary of Assets of the Debtor.* ................................................................. 7

        1.   Cash on Hand. .................................................................................. 7

        2.   Amounts Due From Fund IV. ........................................................... 7

        3.   Amounts Due From Residual Payments. ........................................... 7

        4.   Amounts Due From Service and Maintenance Agreements. ............. 8

        5.   Unnecessary Assets Sold. ................................................................. 8

        6.   Net Operating Losses and Tax Credits. ........................................... 8

        7.   Litigation Assets. ............................................................................. 9

        8.   Miscellaneous Operating Assets. .................................................. 11

    H.   *Summary of Distributions under the Plan.* ................................................. 11

    I.   *Instructions Regarding Voting, Confirmation, and Objections to Confirmation.* ......... 13

        1.   Voting Instructions ......................................................................... 13

        2.   Plan Confirmation. ......................................................................... 16

        3.   Objections to Confirmation ............................................................ 16

        4.   Confirmation Hearing. .................................................................... 17

ARTICLE II.  BACKGROUND INFORMATION REGARDING DEBTOR ........................... 17

    A.   *Significant Events During the Chapter 11 Case.* ....................................... 17

        1.   The Debtor's "First Day" Pleadings. ............................................ 17

        2.   Continuation of Business after Filing. .......................................... 17

        3.   Filing of Schedules. ....................................................................... 18

        4.   Bar Date for Filing of Claims. ....................................................... 18

        5.   Motions to Convert this Case to a Case under Chapter 7. ............. 18

i

6.   Other Motions and Orders Granted in this Case....................................................19

7.   Appointment of the Chapter 11 Trustee................................................................19

8.   Compensation for Shipman & Goodman LLP.......................................................19

9.   Turnover and Sale of Unnecessary Vehicles. .......................................................20

10.  FRBP 2004 Examinations....................................................................................20

11.  Insurance. ...........................................................................................................21

B.   *Non-Bankruptcy Litigation.* ......................................................................................21

1.   Daniel Corey Hiergesell and Dennise Esperanza Flores v. Level
     Solar, Inc..........................................................................................................21

2.   Sonepar Distribution New England, Inc., d/b/a North East Electrical
     Distributors v. Level Solar, Inc...........................................................................21

3.   Grokash Realty Associates, LLC v. Level Solar, Inc. ..........................................21

4.   In re Comeau, Jeffrey.........................................................................................21

5.   New York State Department of Labor Investigation. .............................................22

6.   Ung, Siha v. Workers' Compensation Trust Fund Board.......................................22

7.   David C. Neiger v. Level Solar, et. al. .................................................................22

C.   *Bankruptcy Litigation.* .............................................................................................22

1.   Daniel Corey Hiergesell and Dennise Esperanza Flores v. Level Solar,
     Inc. (the WARN Act Claim). ...............................................................................22

2.   Ronald J. Friedman, Esq., as Chapter 11 Operating Trustee of the Estate
     of Level Solar Inc. v. Long Island Industrial Management LLC............................22

3.   Ronald J. Friedman, Esq., as Chapter 11 Operating Trustee of the Estate
     of Level Solar Inc. v. Electrical Inspectors, Inc...................................................23

4.   Ronald J. Friedman, Esq., as Chapter 11 Operating Trustee of the Estate
     of Level Solar Inc. v. Quick Mount PV ................................................................23

5.   Ronald J. Friedman, Esq., as Chapter 11 Operating Trustee of the Estate
     of Level Solar Inc. v. Prontotype ........................................................................23

6.   Ronald J. Friedman, Esq., as Chapter 11 Operating Trustee of the Estate
     of Level Solar Inc. v. Maypole Environmental Inspections, LLC...........................23

ARTICLE III.  THE PLAN OF REORGANIZATION.................................................................24

A.   *Summary of Payment Provisions of the Plan.*.............................................................24

1.   Impairment of Claims and Interests.....................................................................24

2.   Treatment of Claims and Equity Interests. ...........................................................24

B.   *Claims and Interests*................................................................................................24

1.   Allowed Administrative Claims. ...........................................................................24

ii

2.    Professional Fee Claims.................................................................................... 25

3.    Priority Tax Claims........................................................................................... 25

4.    *Class 1 – Priority Claims*................................................................................ 25

5.    Class 2A – New York Green Bank Claim. ...................................................... 25

6.    Class 2B – Cooper Electric Secured Claim. ................................................... 26

7.    Class 3 – Convenience Claims......................................................................... 26

8.    Class 4 – General Unsecured Claims.............................................................. 26

9.    Class 5 – Preferred Equity Interests................................................................ 26

10.   Class 6 – Common Equity Interests................................................................ 26

C.    *Other Provisions of the Plan*.............................................................................. 27

1.    Monetization of Debtor's Assets. .................................................................... 27

2.    Pell-QED Contribution. .................................................................................. 27

3.    Pell-QED Advance........................................................................................... 27

4.    Establishment of and Transfers to LSI Liquidating Trust. ............................. 27

5.    Discharge of the Trustee. ................................................................................. 28

6.    Distributions..................................................................................................... 28

7.    Causes of Action. ............................................................................................. 28

8.    Objections to Claims........................................................................................ 29

9.    Executory Contracts. ....................................................................................... 29

10.   Releases, Exculpation and Injunctions. .......................................................... 30

11.   Miscellaneous. ................................................................................................. 31

ARTICLE IV.  PLAN CONFIRMATION ...................................................................... 32

A.    *Feasibility*............................................................................................................ 32

B.    *Acceptance.* ......................................................................................................... 33

C.    *Non-Acceptance and Cram Down*...................................................................... 33

D.    *Best Interests Test – Liquidation Analysis.* ....................................................... 33

ARTICLE V.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN...... 34

ARTICLE VI.  MATERIAL UNCERTAINTIES AND RISK FACTORS ................................ 35

A.    *Parties in Interest May Object to the Classification of Claims and Interests*.............. 35

B.    *Failure to Satisfy Vote Requirement.* ................................................................. 35

C.    *The Proponents May Not Be Able to Secure Confirmation of the Plan or Confirmation May Be Delayed.* .................................................................................. 35

D.    *LSI Liquidating Trust May Object to the Amount or Classification of Claims*............ 36

HTRUST/2369879.1/067797

E.    *Risk of Non-Occurrence of the Effective Date.* ............................................................. 36

F.    *Risks Affecting Potential Recoveries.* ......................................................................... 36

G.    *Risks Associated With Forward Looking Statements.* ................................................... 36

ARTICLE VII.  CONCLUSION ................................................................................................. 37

HTRUST/2369879.1/067797

## EXHIBITS

A.  *Second Amended Joint Chapter 11 Plan of Reorganization of the Chapter 11 Trustee and Pell-QED Proponents*

B.  Proposed Order Approving the *Disclosure Statement For Second Amended Joint Chapter 11 Plan of Reorganization of Chapter 11 Trustee and Pell-QED Proponents*

C.  Liquidation Analysis

D.  Amended Plan Supplement

HTRUST/2369879.1/067797

ARTICLE I
INTRODUCTION AND OVERVIEW

**OTHER THAN AS SPECIFICALLY SET FORTH IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS ABOUT IT, ITS BUSINESS, OR ITS FUTURE OPERATIONS.**

        A.    *General.*

        On December 4, 2017 (the "*Commencement Date*"), Level Solar Inc. ("*LSI*" or the "*Debtor*"), commenced a case (the "*Case*") under chapter 11 of the Unites States Code 11 U.S.C. §§ 101-1532, ("*the Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*" or "*Court*").

        The Honorable Robert E. Grossman, United States Bankruptcy Judge presides over the case. On September 28, 2018, Judge Vyskocil ordered the appointment of a trustee for the Debtor under Bankruptcy Code section 1104. On October 9, 2018, Ronald J. Friedman, Esq. was appointed Chapter 11 Trustee (the "*Trustee*").

        Chapter 11 of the Bankruptcy Code allows the Debtor, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization to govern how the Debtor's assets and liabilities will be reorganized. The Trustee, together with Lisa V. Pell and QED, LLC (the "*Pell-QED Proponents,*" and together with the Trustee, the "*Proponents*"), have proposed a Joint Chapter 11 Plan of Reorganization of the Chapter 11 Trustee and Pell-QED Proponents (the "*Plan*"). The Pell-QED Proponents hold the largest general unsecured claims against, and Preferred Equity interests in, the Debtor. A copy of the Plan is annexed to this disclosure statement (this "*Disclosure Statement*") as Exhibit A.[2]

        THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE PLAN ANNEXED AS EXHIBIT A.

        B.    *Purpose of Disclosure Statement.*

        This Disclosure Statement is provided under Bankruptcy Code section 1125 and is intended to provide "adequate information" in connection with the Proponents' solicitation of votes to accept the Plan.[3]

---

[2] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

[3] Bankruptcy Code section 1125 defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity

1

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

(1) who can vote or object;

(2) the Plan's proposed treatment of your Claim (*i.e.*, what you will receive on account of your claim if the plan is confirmed), and how this treatment compares to what you would receive in a liquidation;

(3) the Debtor's history and significant events during the bankruptcy case;

(4) what the Court will consider when it decides whether to confirm the Plan,

(5) the effect of confirmation; and

(6) the Plan's feasibility.

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and your best course of action.

This Disclosure Statement is presented to the holders of Claims (collectively, the "*Claimants*") and of Equity Interests to comply with Bankruptcy Code section 1125 which requires that a disclosure statement provide "adequate information" about the plan. Bankruptcy Code section 1125(a) defines "adequate information" as "information of a kind, and in sufficient detail," about a debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the debtor to make an informed judgment about accepting or rejecting the Plan. You should not rely on this Disclosure Statement for any purpose other than that described above.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE AN INTEGRATED PACKAGE AND YOU SHOULD CONSIDER THEM TOGETHER TO BE ADEQUATELY INFORMED. IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN PROVISIONS WILL GOVERN.

NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY AS TO THE VALUE OF ITS PROPERTY) ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, WHO SHALL IN TURN DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.

of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information."

2

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION CONTAINED IN THE EXHIBITS ATTACHED HERETO, HAS NOT BEEN SUBJECT TO AN AUDIT OR INDEPENDENT REVIEW. ACCORDINGLY, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONCERNING THE DEBTOR OR ITS FINANCIAL CONDITION IS ACCURATE OR COMPLETE. ANY PROJECTED INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PRESENTED FOR ILLUSTRATIVE PURPOSES ONLY, AND BECAUSE OF THE UNCERTAINTY AND RISK FACTORS INVOLVED. THE DEBTOR'S ACTUAL RESULTS MAY NOT BE AS PROJECTED HEREIN.

ALTHOUGH AN EFFORT HAS BEEN MADE TO BE AS ACCURATE AS POSSIBLE UNDER THE CIRCUMSTANCES, THE DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT. THE DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. EACH CLAIMANT WHO IS ENTITLED TO VOTE ON THE PLAN IS URGED TO REVIEW THE PLAN PRIOR TO CASTING SUCH VOTE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THE DISCLOSURE STATEMENT UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE FACTS SET FORTH SINCE THE DATE OF THE DISCLOSURE STATEMENT.

SCHEDULES OF THE ASSETS AND LIABILITIES OF THE DEBTOR AS OF THE DATE OF THE COMMENCEMENT OF ITS BANKRUPTCY CASE (COLLECTIVELY AND AS AMENDED, THE "SCHEDULES") ARE ON FILE WITH THE CLERK OF THE BANKRUPTCY COURT AND MAY BE INSPECTED BY INTERESTED PARTIES DURING REGULAR BUSINESS HOURS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, INTERESTS IN, OR SECURITIES OF THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

The Proponents have requested that the Bankruptcy Court enter an order (the "*Disclosure Order*") approving the Disclosure Statement and its Exhibits as containing adequate information

HTRUST/2369879.1/067797

of a kind and in sufficient detail that would enable a reasonable, hypothetical investor typical of a holder of impaired claims or interests to make an informed judgment about the Plan. A copy of the Disclosure Order, when entered, will be annexed to this Disclosure Statement as Exhibit B. The Disclosure Order, however, will not constitute the Bankruptcy Court's recommendation either for or against the Plan.

The Disclosure Statement is provided to each creditor whose claim the Debtor has scheduled or who has filed a Proof of Claim against the Debtor, and to each interest holder of record as of the date the Disclosure Statement is approved. Under the Bankruptcy Code, the Proponents may not solicit your acceptance of the Plan may not be solicited unless you receive a copy of the Disclosure Statement before or concurrently with the solicitation.

To obtain, at your cost, additional copies of the Plan or the Disclosure Statement please contact:

> Anthony C. Acampora, Esq.
> SilvermanAcampora LLP
> 100 Jericho Quadrangle, Suite 300
> Jericho, New York 101753
> Telephone: (516) 479-6300
> Facsimile: (516) 937-7002
> AAcampora@SilvermanAcampora.com

C.      *Brief Explanation of Chapter 11.*

Chapter 11 is the Bankruptcy Code's principal business reorganization section. Under chapter 11, the Debtor may reorganize its business affairs to benefit itself, its creditors, and other interest holders. While the Case is pending, all attempts to collect pre-petition claims from the Debtor, or to foreclose upon the Debtor's property, are stayed unless the Bankruptcy Court orders otherwise.

The objective of a chapter 11 case is the formulation of a plan of reorganization, which is the vehicle for resolving claims against the Debtor and providing for its future direction.

Creditors are entitled to vote on any proposed plan. In determining acceptance of the Plan, votes are counted only if submitted by a creditor whose claim is duly scheduled by the Debtor as undisputed, non-contingent, and unliquidated, or who, before the Confirmation Hearing, has filed a proof of claim not disallowed or suspended before computation of the votes on the Plan. All shareholders of record as of the date of approval of the Disclosure Statement may vote on the Plan. The Ballot Form you received does not constitute a Proof of Claim. If you are uncertain whether your claim was correctly scheduled, you should check the Debtor's Schedules, which are on file at the office of the Clerk of the Bankruptcy Court at: United States Bankruptcy Court, U.S. Court House, One Bowling Green New York, NY 10004-1408. The Clerk of the Bankruptcy Court will not provide this information by telephone.

HTRUST/2369879.1/067797

The Court has not yet confirmed the Plan and the Plan is not yet binding on anyone. To be binding, the Plan must be confirmed by the Bankruptcy Court. Once the Plan is confirmed, all claims against the Debtor which arose before the chapter 11 case commenced are extinguished, unless the Plan preserves them.

      D.    *Confirmation and Consummation of the Plan.*

It will be a condition to Plan Confirmation that all of the Plan's terms and conditions are approved in the Confirmation Order or otherwise satisfied or waived. The Plan will be consummated on the Effective Date, when all of the Debtor's right, title, and interest in the LSI Liquidating Trust Assets, including, without limitation, all Avoidance Actions and Causes of Action will transfer to the LSI Liquidating Trust. The LSI Liquidating Trustee will liquidate the LSI Liquidating Trust Assets and, at the LSI Liquidating Trustee's discretion, may commence Avoidance Actions or Causes of Action, to make distributions to Holders of Allowed Claims.

      E.    *Risk Factors.*

BEFORE DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, YOU SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THE DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VI TITLED, "MATERIAL UNCERTAINTIES AND RISK FACTORS."

      F.    *Brief Overview of the Debtor and the Plan.*

        1.    *Summary of the Plan.*

The Plan generally provides for (a) the payment in full on the Effective Date of Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims that are Allowed as of the Effective Date, with those types of Claims that are not then Allowed to be paid by the LSI Liquidating Trustee on a Pro Rata basis when other administrative expenses of the LSI Liquidating Trust are paid; (b) the assignment to New York Green Bank of the Debtor's right to receive all distributions on account of the Debtor's Master Holdings Interest until the New York Green Bank Debt is paid in full; (c) the transfer of substantially all of the Debtor's assets (but not its Tax Rights, the retained LSI Intellectual Property, or the Master Holdings Interest) to the LSI Liquidating Trust; and (d) the issuance of issuance of LSI Liquidating Trust Certificates to holders of Allowed General Unsecured Claims. All existing Common Equity Interests in the Debtor will be cancelled and their Holders will receive nothing of value under the Plan. To enable the Debtor to pay the amounts that will be payable on the Effective Date and to fund appropriate reserves for payments that may become due thereafter, the Pell-QED Proponents will make the Pell-QED Contribution, in exchange for which they will be issued all of the Equity Interests in the Reorganized Debtor (which shall retain the retained LSI Intellectual Property, the Tax Rights, and the Master Holdings Interest), and will make the Pell-QED Advance, which will constitute an expense of the LSI Liquidating Trust.

HTRUST/2369879.1/067797

2.      *Reasons for the Chapter 11 Filings.*

The Debtor was a solar energy company servicing New York City and Long Island (Nassau and Suffolk County), New York and Boston, Avon and Westwood, Massachusetts. The Debtor's business model revolved around contracting with homeowners who would allow the Debtor to install solar panels on the roof of their homes and would commit to buy power from the Debtor to fulfill their daily energy needs. If the solar panels produced more energy than the homeowner used, the Debtor sold that excess energy for use in conjunction with the traditional energy grid. The Debtor expected to generate cash flow from excess energy sales and retained a residual interest in the solar panel arrays and associated tax benefits.

The Debtor financed its purchase of solar panel arrays through two principal funding sources structured to cover the purchase, installation, and permitting of this equipment. These financings were effectuated through separate entities owned by the Debtor. Two (2) of the entities, Level Solar Fund I LLC ("*Fund I*") and Level Solar Fund II LLC ("*Fund II*"), both of which are Delaware limited liability companies, (collectively the "*Green Bank Funds*"), addressed the rights and responsibilities of the Debtor and the NY Green Bank, a division of the New York State Energy Research & Development Authority. The other two (2) entities, Level Solar Fund III LLC ("*Fund III*") and Level Solar Fund IV LLC ("*Fund IV*"), both of which are Delaware limited liability companies, (collectively the "*Firstar Funds*") addressed the rights and responsibilities of the Debtor and Firstar Development LLC, a Delaware limited liability company.

Until September 2017, the Debtor was the Managing Member of each fund; either directly with the Green Bank Funds or through affiliates (Level Solar Holdings III LLC and Level Solar Holdings IV LLC) with the Firstar Funds. The organizational structure is set forth below:



6

G.      *Summary of Assets of the Debtor.*[4]

The Trustee has identified the following assets which will be utilized in connection with the Plan:

1.      *Cash on Hand.*

As of October 16, 2019, the Debtor has cash on hand of $696,519.30. The Proponents believe this cash is available to fund the Plan. However, counsel for the Green Bank Funds and the Firstar Funds' have asserted this cash should be held in constructive trust for those Funds. Specifically, Level Solar Customer Arrays LLC ("*LSCA*") and Fund II filed papers which state that: "Debtor received, but improperly held in its operating account, $150,905.25 in 'Customer Funds' that should have been delivered to LSCA and Fund II, specifically $77,490.42 that belongs to LSCA and $73,414.83 that belongs to Fund II." Similarly, the Firstar Funds filed papers which state that: "Upon information and belief, the revenue from those projects were deposited into two of the Debtor's prepetition bank accounts, which the Debtor has since combined into one bank account post-petition. The Debtor has no legal or equitable interest in such cash, therefore, such funds are not property of the Debtor's estate and the Debtor has no authority to use such amounts." It is not clear how the Green Bank Funds or the Firstar Funds conclude this. They seem to base this on the fact that, pre-petition, the Debtor had bank accounts labeled by fund name (and by other operating purpose name), including pre-petition accounts ending in x8614 (LSCA), x0568 (Fund III), and x0569 (Fund IV). There was no known pre-petition account identified as used for Fund II.

The funds held in the Debtor's pre-petition accounts ending in x8614, x0568 and x0569 before consolidation with the main operating account were $970, ($26.90) and $79,154.07, respectively. Even if the Green Bank Funds and the Firstar Funds' theory was correct, the most this would have effected was $80,097.17. This leaves $616,422.13 of cash on hand to contribute to the Plan even if the Trustee must hold $80,097.17 in reserve until this dispute is resolved.

2.      *Amounts Due From Fund IV.*

The Debtor may hold claims against Fund IV and others for a breach of a December 16, 2016 Development, EPC, and Purchase Agreement relating to Tranche B funding for approximately 114 solar systems now in service. Fund IV contests the amount due to the Debtor.

3.      *Amounts Due From Residual Payments.*

There are currently approximately 2,732 solar systems in service that the Debtor transferred to the Green Bank and Firstar Funds. These systems are subject to PPAs between the Funds and the homeowners on whose homes the systems are installed. Tax investors, including Firstar, provided the initial funding to build the systems and recovered most of its investment through incentive tax credits. New York Green Bank provided the balance of the funds required

---

[4] The Joint Proponents performed no diligence regarding the veracity of the statements contained in certain sections of this subsection and instead rely on the statements contained in the Second Amended Disclosure Statement filed by Level Solar Inc. on October 5, 2018 (ECF Doc. No. 275), which was filed before the Trustee's appointment.

HTRUST/2369879.1/067797

to build the systems through a secured loan and has a security interest them, as well as the Master Holdings Interest. The Debtor and Master Holdings are currently in default on the New York Green Bank Debt in accordance with the terms of the New York Green Bank Loan Documents.

After the Green Bank Funds and the Firstar Funds pay debt service to New York Green Bank and satisfy certain other obligations, Master Holdings is entitled to receive payments of residual cash from them. Under the New York Green Bank Loan Documents, Master Holding may not make any distributions to the Debtor or the Reorganized Debtor until the New York Green Bank Debt (which is currently estimated to be approximately $23 million, plus the continuous accrual of interest and charges) has been paid in full.  Under the Plan, the Reorganized Debtor will retain its membership interest in Master Holdings.

<em>4.    Amounts Due From Service and Maintenance Agreements.</em>

The Debtor has claims against third parties for breach of several agreements relating to its sourcing, servicing, and maintenance of the Green Bank Funds and Firstar Funds. The Joint Proponents estimate that those claims have value to the estate in excess of $500,000, although the Trustee's reconciliation of damages is ongoing and will be continued by the LSI Liquidating Trust in the absence of a settlement between the parties.

<em>5.    Unnecessary Assets Sold.</em>

The Debtor owned (6) vehicles. Three (3) of these vehicles were used in the Debtor's operations and three (3) were classic VW Vans. William Frey consigned the three (3) classic VW Vans to a classic and collectible car dealership, Hollywood Motors, to be sold. Two (2) of the three (3) classic VW Vans were sold by Hollywood Motors on March 28, 2018 and April 3, 2018, respectively. Pursuant to the Trustee's demands, Hollywood Motors turned over the proceeds from the sales of the two (2) classic VW Vans and the remaining unsold classic VW Van to the Trustee. The Trustee's auctioneer then sold the remaining VW Van and the three (3) vehicles used in the Debtor's operations at auctions held on April 30, 2019 and May 21, 2019, respectively. The proceeds from the sales of the six (6) vehicles totaled $89,150.00.

<em>6.    Net Operating Losses and Tax Credits.</em>

Under the Plan, on the Effective Date, Lisa Pell and QED, LLC will deliver to the Trustee the Pell-QED Contribution in exchange for (i) 100% of the Equity Interests in the Reorganized Debtor, (ii) the retained LSI Intellectual Property, (iii) the Tax Rights, (iv) subject to the prior rights of (a) New York Green Bank under Section 4.02 and (b) the LSI Liquidating Trust to receive all distributions from Level Solar Master Holdings I, LLC until all amounts payable on account of LSI Liquidating Trust Certificates have been paid in full, the Debtor's Master Holdings Interest, and (v) the releases described in section 10.06 of this Plan. As defined in the Plan, the Debtor's Tax Rights includes the right to use the Debtor's net operating losses (the "*NOLs*"). To help understand Net Operating Losses and General Business Tax Credits, which the Reorganized Debtor would retain under the Plan, the following is a description of how NOLs and tax credits work and the estimated NOLs LSI generated from the 2016, 2017, and

8

2018 tax years.

The Internal Revenue Code, 26 U.S.C. § 1 et seq. (the "*IRC*") delineates very specific requirements and procedures for preserving NOLs within, and outside of, chapter 11, and includes, in IRC section 382, very specific limitations on NOLs that arise before certain changes in a company's equity ownership. Following the procedures and limitations in IRC section 382, a debtor can structure a plan of reorganization that will allow it to utilize all of its NOLs.

IRC section 382 limits the ability to utilize NOLs that exist before a corporation's ownership change. Generally, a Section 382 ownership change occurs when the percentage of corporation's equity changes by over 5%. In chapter 11 cases, debtors frequently pay off creditors by issuing new equity. This could trigger a section 382 ownership change and prevent the utilization of the company's NOLs.

To prevent this unintended result, Congress added special bankruptcy rules to IRC section 382. Generally, a company can change the ownership of 50% of the chapter 11 debtor without losing its pre-change NOLs. To qualify for IRC § 382(l)(5), a debtor must continue with its pre-petition business and the debtor's pre-change shareholders and "qualified creditors" together, must own, 50% or more of the fair market value and voting power of the debtor's stock immediately after the change. *See* IRC § 382(l)(5).

Based on the tax law changes in the Tax Cuts and Jobs Act, after 2017, the overall NOL carryforward can offset corporate taxable income up to 80% in a year.

The estimated NOLs generated from the 2016, 2017, and 2018 tax years totals approximately $14.6 million based on trial balance and book/tax difference items provided by the Debtor's prior accountants and the Estate's retained accountants and certain Schedule K-1s from Funds I, III and IV.  The Trustee's accountants are still in the process of finalizing the Debtor's tax returns, which will determine the Debtor's overall NOL carryforward.

The Trustee consulted with investment bankers, solar energy industry experts, and his professionals regarding the marketability of the NOLs to a hypothetical third party purchaser aside from the Pell-QED Proponents.  The Trustee was informed that the NOLs are not marketable or of value to a hypothetical third party purchaser under IRC § 382(l)(5) because the Pell-QED Proponents own approximately 52.6% of the Debtor's equity.[5]

>    7.    *Litigation Assets.*

The Proponents are investigating potential litigation claims against various parties. These include potential claims against:

>    (i)    Firstar Development, LLC, U.S. Bancorp, and entities related to them. Firstar, a
>    Delaware limited liability company, is an investment arm of U.S. Bancorp that

---

[5] QED, LLC owns approximately 42% of the outstanding equity in the Debtor and Lisa Pell, the wife of Richard Pell, the former Secretary of the Debtor, owns approximately 10.6% of the outstanding equity in the Debtor.

9

owns tax equity investments in U.S. renewable energy projects. Firstar owns 100% of the Class A Membership interests of Level Solar Fund III, LLC and 50% of the Class A membership interest of Level Solar Fund IV, LLC. An affiliate of Firstar is the non-member manager of each of those funds. The claims the Proponents are investigating include claims related to Firstar or its affiliate's management of the Firstar Funds, as well as claims related to the manner in which U.S. Bancorp, Firstar, and certain of their affiliates arranged tax equity investments in the Firstar Funds and Level Solar Fund II, LLC, and their involvement in valuing the assets those funds purchased from the Debtor, for which they were allocated and likely claimed various U.S. and state tax credits and deductions;

(ii)     Novogradac & Company LLP in connection with, among other things, professional accounting malpractice related to the audit of the Debtor's 2015 and 2016 financial statements, and its aiding and abetting breaches of fiduciary duty and fraud by the Debtor's founder and former Chief Executive Officer.

(iii)    William Frey in connection with his role as the Debtor's former President and Chief Executive Officer.

(iv)     Richard Keiser in connection with his role as the Debtor's former Chief Executive Officer.

(v)      Richard Pell in connection with his role as the Debtor's former Treasurer.

(vi)     Carrie Frey in connection with her role as the Debtor's former Secretary.

(vii)    Scott Paterniani, in connection with his role as the Debtor's former Controller.

(viii)   claims for breach of contracts between the Debtor and some of its former employees related to their misappropriation of the Debtor's confidential business information for their own use or for the use of their employers who are competitors of the Debtor, and claims against some of those competitors, including Sunrun, Inc., Venture Home Solar, Solar Dad & Sons, Inc., Momentum Solar, EmPower Solar, Vivint Solar, Long Island Power Solutions, Simply Residential, LLC, Grid City Electric Corp., Trinity Solar, Solar City, and KamTech Solar, among others.

(ix)     the Debtor's former law firm, Faber Daeufer & Itrato PC.

(x)      claims against Salefsorce.com, Inc. in connection with, among other things, the return of funds due from, and the loss of customer data because of Salefsorce.com, Inc.'s mismanagement of services in accordance with its contract to maintain, store, and preserve the Debtor's online customer resource management system used by the Debtor to (a) service its own customers as well as customers of Level Solar Fund I LLC, Level Solar Customer Arrays LLC,

10

HTRUST/2369879.1/067797

Level Solar Fund II LLC, and the Firstar Funds, and (b) store information concerning sales leads for potential new customers.

The Trustee's remaining litigation assets include his rights to bring avoidance actions, claims under chapter 5 of the Bankruptcy Code and other claims and litigation. Article II.C herein sets forth an explanation of the actions the Trustee has already commenced under chapter 5 of the Bankruptcy Code. The Trustee has not yet completed his investigation regarding pre-petition transactions including preferences, fraudulent conveyances, claims against insiders, professional negligence claims against accountants and attorneys, negligence claims against former officers and employees, claims to recover estate assets. Investigation regarding the claims is ongoing and further investigation of the claims is necessary. The right to prosecute the will be transferred to the LSI Litigation Trust as of the Effective Date.

> 8.    *Miscellaneous Operating Assets.*

The following miscellaneous operating assets will be maintained by the Reorganized Debtor under the Plan: the Tax Rights and the retained LSI Intellectual Property, and the Master Holdings Interest.

Any right to use the NOLs of the Debtor or general business credit carryovers, would be lost if they are not retained by the Reorganized Debtor. For similar reasons, the Tax Rights would be lost if the holders of Equity Interests in the Debtor do not retain at least 50% of the value and voting power of their Equity Interests in the Reorganized Debtor due to the Plan. *See* IRC § 382.

The LSI Intellectual Property includes the Debtor's name, any internet domain name or social media account, any trademarks, and any patents owned by the Debtor (the Debtor is not aware of any patents owned by the Debtor). These assets have no operating value to the LSI Liquidating Trust and would likely have *de minimis* value in an auction sale, but these assets will allow the Reorganized Debtor to continue its business operations under the LSI name.

> H.    *Summary of Distributions under the Plan.*

**THE FOLLOWING IS A BRIEF SUMMARY OF THE PLAN'S CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS. IT IS ONLY A SUMMARY. WE URGE YOU TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN ARTICLE III OF THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF. THE PLAN IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A.**

Reorganizing the Debtor's business under the Plan should yield greater returns to unsecured creditors and equity holders than would be realized if the Debtor is liquidated under Chapter 7 of the Bankruptcy Code. Under a Chapter 11 reorganization, the Pell-QED Proponents will put new money into the Debtor's Estate (the Pell-QED Contribution) and will fund the LSI Liquidating Trust (the Pell-QED Advance) to facilitate the LSI Liquidating Trust's efforts to maximize the value of the Estate's remaining assets. For a more detailed explanation, please

HTRUST/2369879.1/067797

refer to Article III below.

Below is a summary of the classification and treatment of Allowed Claims and Equity Interests and the distribution that holders of such Claims and Equity Interests may expect to receive under the Plan. This summary is qualified in its entirety by reference to the provisions of the Plan.

**THE FOLLOWING AMOUNTS ARE MERELY THE PROPONENTS' ESTIMATES BASED ON INFORMATION AVAILABLE AS OF THE FILING OF THIS DISCLOSURE STATEMENT. THE ACTUAL AMOUNTS COULD BE SUBSTANTIALLY DIFFERENT, CAUSING THE ULTIMATE DISTRIBUTIONS TO CREDITORS TO BE SIGNIFICANTLY HIGHER OR LOWER THAN ESTIMATED.**

For a more detailed description of these classifications and certain other significant terms and provisions of the Plan, please refer to Article III below.

| DESCRIPTION OF CLASSES AND ANTICIPATED AMOUNT OF ALLOWED CLAIMS | DESCRIPTION OF PROPOSED DISTRIBUTION UNDER THE PLAN | ESTIMATED RECOVERY |
|---|---|---|
| Class 1 - Priority Claims<br><br>Anticipated to be approximately $657,736.84 based on the currently filed claims as of the Effective Date. | Unimpaired - Allowed Priority Claims will be paid their Allowed amount in Cash on the later of the Effective Date or ten days after an Order allowing the Claim becomes a Final Order. | 100% |
| Class 2A - New York Green Bank Secured Claim | Impaired - Until the Green Bank Debt is paid in full, the New York Green Bank will be entitled to receive all distributions on account of the Debtor's Master Holdings Interest, and shall have a non-recourse lien against all of those distributions. | Up to 100% |
| Class 2B – Cooper Electric Secured Claim | Impaired – Allowed Secured Claim will be paid $820,000 in Cash on the Effective Date and will have an Allowed Class 4 General Unsecured Claim in the amount of $1,530,000. | $820,000 |

HTRUST/2369879.1/067797

| | | |
|---|---|---|
| Class 3 - Convenience Claims<br><br>Anticipated to be approximately $59,149.03 based on the currently filed claims as of the Effective Date. | Impaired - Allowed Convenience Claims will be paid twenty percent of their Allowed amount in Cash on the later of the Effective Date or ten days after an Order allowing the Claim becomes a Final Order. | Up to 20% |
| Class 4 - General Unsecured Claims<br><br>Anticipated to be approximately $18,834,618.19 based on the currently filed claims as of the Effective Date. | Impaired – Allowed General Unsecured Claims will receive their Pro Rata share of LSI Liquidating Trust Certificates. | Unknown[6] |
| Class 5 – Preferred Equity Interests | Impaired – Preferred Equity Interests will be cancelled and their Holders will receive nothing of value.<br>. | Zero |
| Class 6 - Common Equity Interests | Impaired - Common Equity Interests will be cancelled and their Holders will receive nothing of value. | Zero |

      I.    *Instructions Regarding Voting, Confirmation, and Objections to Confirmation.*

      1.    *Voting Instructions.*

**BEFORE VOTING, YOU SHOULD READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS, INCLUDING THE PLAN AND ITS EXHIBITS, IN THEIR ENTIRETY.**

The Proponents have asked that the United States Bankruptcy Court to review this Disclosure Statement and, if appropriate, enter the Disclosure Order, determining this document contains "adequate information" so creditors can meaningfully evaluate the Plan. A copy of the Disclosure Order is annexed hereto as Exhibit B. The Disclosure Order does not constitute a ruling on the Plan's merits, feasibility, or desirability. The Bankruptcy Court will not consider

---

[6] Due to the nature of the LSI Liquidating Trust Assets, the Joint Proponents cannot state with certainty what recovery will be available to Holders of Claims as any sale or other disposition of the LSI Liquidating Trust Assets yet to occur and recoveries on any Causes of Action are speculative. In addition, the Joint Proponents cannot know with certainty, at this time, the number or size of Claims in Classes 3 and 4 that will ultimately be Allowed.

HTRUST/2369879.1/067797

those issues or whether the Plan should be confirmed until creditors have voted on the Plan.

All creditors entitled to vote on the Plan may cast their vote for or against the Plan by completing, dating, signing, and causing the Ballot Form accompanying this Disclosure Statement to be returned to the following address:

> SilvermanAcampora LLP
> 100 Jericho Quadrangle, Suite 300
> Jericho, New York 11753
> Tel: (516) 479-6300
> AAcampora@SilvermanAcampora.com
>
> Attn: Anthony C. Acampora, Esq.
> Counsel for Ronald J. Friedman, Esq.
> Chapter 11 Trustee

You should use the ballot sent to you with this Disclosure Statement to cast your vote for or against the Plan. You may NOT cast ballots or votes orally. To be considered, your ballot must be received at the above address by the time designated in the notice accompanying this Disclosure Statement. Any ballot executed by the holder of an Allowed Claim that does not indicate acceptance or rejection of the Plan will be considered a vote to accept the Plan. If you are a Holder of a Claim or Equity Interest and did not receive a ballot with this Disclosure Statement, you may obtain a ballot by contacting:

> SilvermanAcampora LLP
> 100 Jericho Quadrangle, Suite 300
> Jericho, NY 11753
> Tel: (516) 479-6300
> AAcampora@SilvermanAcampora.com
>
> Attn: Anthony C. Acampora, Esq.
> Counsel for Ronald J. Friedman, Esq.
> Chapter 11 Trustee

Any party in interest may object to the Plan's confirmation, but as explained below not everyone may vote to accept or reject the Plan. Only holders of Allowed Claims or Interests in Classes 2A, 2B, 3, and 4, may vote to accept or reject the Plan. Class 1 will not vote because under Bankruptcy Code section 1129(f) it is deemed to have accepted this Plan. Classes 5 and 6 will not vote because under Bankruptcy Code section 1129(g) they are deemed to have rejected the Plan.

Generally, any proof of claim or interest will be allowed unless a party in interest moves to object to the claim. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the class's members. For example, a class comprising general unsecured claims is impaired if the Plan fails to pay the class's members 100% of their claim plus interest. Here, all classes of creditors are treated as impaired.

HTRUST/2369879.1/067797

The record date for voting on the Plan is _____.[7] Persons holding Claims transferred after _____ will NOT be permitted to vote. An impaired Class of Claims accepts the Plan if at least two-thirds (2/3) in an amount, and more than one-half (1/2) in number, of the Allowed Claims in the Class actually voted are cast in favor of the Plan. An impaired Class of Equity Interests accepts the Plan if at least two-thirds (2/3) in amount of Allowed Equity Interests in the Class actually voted are cast in favor of the Plan. Subject to the terms of the Plan, Claimants and Equity Interest holders who do not vote are not counted as having voted either for or against the Plan. Under Bankruptcy Code section 1126, the Bankruptcy Court may disallow any vote accepting or rejecting the Plan if it is not cast in good faith.

A Claimant's or Equity Interest holder's failure to vote on the Plan will not affect its right to a Distribution under the Plan.

If an impaired class's voting members do not vote unanimously for the Plan but, nonetheless, vote for the Plan by at least the requisite two-thirds (2/3) in amount and one-half (1/2) in number of Allowed Claims or Equity Interests actually voted in that Class, the Plan, at a minimum, must provide that each class member will receive property of a value determined as of the Effective Date that is not less than the amount the class members would receive or retain if the Debtor's estate was liquidated under chapter 7 of the Bankruptcy Code.

The Trustee or the LSI Liquidating Trustee may dispute Proofs of Claim or Equity Interests filed or that the Debtor listed as disputed, unliquidated, or contingent in its Schedules filed with the Bankruptcy Court. Holders of Disputed Claims or Equity Interests may vote on the Plan and otherwise participate in Plan distributions only if the Bankruptcy Court allows their Claims or Equity Interests. The Bankruptcy Court may temporarily allow a Claim or Equity Interest for voting only. The Debtor's Schedules, which list Claims and whether they are disputed, may be inspected at the Office of the Clerk of the United States Bankruptcy Court for the Southern District of New York, 1 Bowling Green, New York, New York 10004-1408.

The Bankruptcy Court has established June 11, 2018 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for filing all Proofs of Claim in the Case (the "*Bar Date*").

A claim or interest may be Allowed even if it was not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to it.

If the Bankruptcy Court confirms the Plan its terms, including its treatment of Claims or Equity Interests, will bind all Holders of Claims and Equity Interest regardless of whether any particular Holder voted. Allowance or disallowance of a Claim or Equity Interest for voting purposes does not necessarily mean that all or a portion of that Claim will be allowed or disallowed for Distribution purposes.

---

[7] The date on which the Bankruptcy Court enters an order approving this Disclosure Statement.

HTRUST/2369879.1/067797

2.    *Plan Confirmation.*

Once it is determined which impaired Classes have or have not accepted the Plan, the Bankruptcy Court will determine whether the Plan may be confirmed. If all impaired Classes accept the Plan, it will be confirmed provided that the Bankruptcy Court finds the other conditions in Bankruptcy Code section 1129(a) have been satisfied.

**THESE ARE COMPLEX STATUTORY PROVISIONS, AND THE PRECEDING PARAGRAPHS ARE NOT INTENDED TO BE A COMPLETE SUMMARY OF THE LAW. IF YOU DO NOT UNDERSTAND ANY OF THESE PROVISIONS, PLEASE CONSULT WITH YOUR ATTORNEY. IF ALL CLASSES DO NOT ACCEPT THE PLAN, THE PROPONENTS INTEND TO RELY UPON THE "CRAM DOWN" PROVISION OF BANKRUPTCY CODE SECTION 1129(b).**

The Bankruptcy Court may confirm the Plan, even if the impaired Classes do not accept the Plan, if the Bankruptcy Court finds that certain additional conditions are met. If the Plan is not accepted by the requisite amount of Claims or Equity Interests, the Proponents will seek confirmation of the Plan as to such non-accepting Class or Classes under Bankruptcy Code section 1129(b). This section is generally called the "cram-down" provision. The Bankruptcy Court may confirm the Plan over the objection of a non-accepting Class of Unsecured Claims or Equity Interests if the Plan satisfies one of the alternative requirements of Bankruptcy Code section 1129(b)(2)(B) or (C). The Bankruptcy Court may confirm the Plan over the objection of a non-accepting Class of Unsecured Claims or Equity Interests if the non-accepting members of the Class will receive the value of their Claims or Equity Interests, or, if the non-accepting members of the Class stand to receive less than value, no Classes of junior priority will receive anything because of their respective Claims or Equity Interests. The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting classes of claims or interests if it meets all consensual requirements except the voting requirements of Bankruptcy Code section 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in Bankruptcy Code section 1129(b) and applicable case law.

3.    *Objections to Confirmation.*

Any objections to confirmation of the Plan must be filed with the Clerk of the Bankruptcy Court and served upon (a) SilvermanAcampora LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York 11573, Attention: Anthony C. Acampora, Esq.; (b) Wollmuth Maher & Deutsch LLP, 500 Fifth Avenue, New York, New York 10110, Attention: Paul R. DeFilippo, Esq., and Brad J. Axelrod, Esq.; and (c) The Office of the United States Trustee for the District of New York, 201 Varick Street, Rm 1006, New York, New York 10004, Attention: Benjamin J. Higgins, Esq., in such manner as will cause such objections to be filed with the Bankruptcy Court and received by the parties no later than _____, at 4:00 p.m. (Prevailing Eastern Time).

HTRUST/2369879.1/067797

4.    *Confirmation Hearing.*

A hearing on confirmation of the Plan (the "*Confirmation Hearing*") is scheduled to be held before the Honorable Robert Grossman, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, 1 Bowling Green, Room 501, New York, New York 10004, New York, New York on _____ at ___:00 a.m. (Prevailing Eastern Time). Announcement of the adjournment of such hearing may be made in writing or in open court. No further written notice must be sent to claimants, interest holders, or other parties in interest. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the Bankruptcy Code, including whether the Plan is in the best interests of the Claimants and Equity Interest holders, and will review a ballot report about votes cast for acceptance and rejection of the Plan.

ARTICLE II
BACKGROUND INFORMATION REGARDING DEBTOR

A.    *Significant Events During the Chapter 11 Case.*

1.    *The Debtor's "First Day" Pleadings.*

On December 11, 2017, the Debtor filed motions with the Bankruptcy Court seeking to continue its existing cash management system and maintain its existing business forms and bank accounts, and a motion for an order authorizing the Debtor to continue its insurance policies and programs (ECF Doc. Nos. 10 and 11). On December 13, 2017, the Bankruptcy Court granted these motions on an interim basis (ECF Doc. Nos. 18 and 19). On January 23, 2018, the Debtor withdrew its motion to continue using its existing cash management system and maintain its existing business forms and banks accounts based on the request of the New York Green Bank and Firstar that the Debtor migrate its responsibilities in the collection and distribution of ACH payments from solar energy customers to SUNation Service, rendering the need for multiple pre-petition bank accounts unnecessary (ECF Doc. No. 31). On January 26, 2018, the Bankruptcy Court granted the Debtor's motion for an order authorizing the Debtor to continue its insurance policies and programs (ECF Doc. No. 34).

2.    *Continuation of Business after Filing.*

The Debtor continued to manage the operations and affairs of the Company as debtors in possession, subject to the oversight of the Bankruptcy Court. Certain actions of the Debtor during the pendency of this Case, including any transactions outside of the ordinary course of business, were taken only after first requesting and receiving authorization from the Bankruptcy Court.

After filing the Petition, the Debtor:

(a)    Transitioned the legacy integrated solar business by: (i) entering into surrender agreements with landlords to eliminate liability on 13 of 14 leases in New York, Massachusetts, and Rhode Island, (ii) disposing of inventory to multiple vendors, (iii)

17

selling or arranging for the potential sale of multiple vehicles, (iv) working with leasing companies to return leased vehicles, copiers and forklifts, (v) identifying a replacement servicer and transitioning servicing of existing solar arrays to the same, (vi) communicating with and monitoring this replacement servicer, (vii) establishing accounting function and creation of books and records for 2016 and 2017 to allow for tax filings, (viii) beginning forensic accounting process, (ix) dealing with employee issues including processing unemployment claims and ongoing worker's compensation claims, W2s, etc., (x) responding to various lawsuits and State Attorney General issues, (xi) responding to WARN Act issues and inquires, (xii) identifying the non-tangible assets of LSI, (xiii) processing mail from the LSI facilities, evaluating and eliminating unnecessary insurance policies, (xiv) terminating utility services, and (xvi) assisting with ongoing LSI customer support.

(b)    Established and secured the existing assets of LSI by: (i) working with banking parties to ensure a smooth transition of multiple accounts to DIP account, (ii) consolidating banking records, (iii) recording ownership of the SRECs in Massachusetts and securing payment of same, and (iv) negotiating with vendors for reduced software costs and are negotiating with the largest vendor-creditor to substantially reduce its claim.

3.    *Filing of Schedules.*

On January 26, 2018, the Bankruptcy Court granted a motion extending the time for the Debtor to file its schedules of assets and liabilities, and list of creditors and executory contracts required under Bankruptcy Code section 521 and Bankruptcy Rule 1007 regarding Schedules, and related Statement of Financial Affairs ("*SOFA*") to January 26, 2018 (ECF Doc. No. 33). Also on January 26, 2018, the Debtor filed its Schedules and SOFA.

4.    *Bar Date for Filing of Claims.*

On May 3, 2018, the Bankruptcy Court entered an Order Establishing Deadlines and Procedures for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof (ECF Doc. No. 164), stating that all Proof of Claims must be Filed in writing or electronically on the Bankruptcy Court's website at www.nysb.uscourts.gov so that it is received on or before June 11, 2018, at 5:00 p.m. (Prevailing Eastern Time). The Debtor gave notice of the Bar Date to all known actual or potential claimants and informed them of their need to file a Proof of Claim with the Bankruptcy Court.

5.    *Motions to Convert this Case to a Case under Chapter 7.*

On February 28, 2018, Richard Keiser ("Keiser") moved for an order converting this Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code based on one or more of these four theories: "(i) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (ii) the Debtor's failure to make any progress in the Case and its unexcused failure to timely provide information reasonably requested by the United States trustee; (iii) the Debtor's improper use of the Case solely to pursue the litigation strategy of its Investors; and (iv) the Debtor's mismanagement by the

18

Investors and their material misrepresentations to the Bankruptcy Court and the creditors on behalf of the Debtor" (ECF Doc. No. 71). The Bankruptcy Court denied this motion on April 13, 2018 (ECF Doc. No. 150).

On July 20, 2018, Keiser again moved for an order converting this Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code on substantially the same basis as the prior motion (ECF Doc. No. 204). As discussed below, although the Bankruptcy Court determined that cause existed to convert the Debtor's case to a case under Chapter 7, the Bankruptcy Court found it was in the best interests of the Debtor's estate and its creditors to appoint a Chapter 11 trustee.

> 6.      *Other Motions and Orders Granted in this Case.*

During the first seven (7) months of this Bankruptcy Case, the Debtor filed several requests for orders authorizing the Debtor to conduct 2004 examinations and related document discovery of third parties to obtain information relating to the administration of this Bankruptcy Case and to determine potential claims for recovery of assets that can be used by the Debtor's estate to satisfy the Claims of its Creditors. Except for those cases where, after voluntary compliance it was determined appropriate to withdraw the motion, and with Keiser, who resisted turning over any information to the Debtor, each motion was granted and discovery is ongoing.

In addition, the Debtor rejected the three (3) non-residential leases that remained as of the Petition Date and numerous leases of vehicles as of the Petition Date. In each case, consensual orders were entered allowing those creditors to recover their property.

> 7.      *Appointment of the Chapter 11 Trustee.*

On September 28, 2018, the Bankruptcy Court entered an order appointing a Chapter 11 trustee.  The Bankruptcy Court found by clear and convincing evidence that the best interests of the Debtor's estate and its creditors would be served by the appointment of a Chapter 11 trustee. The Bankruptcy Court cited numerous reasons supporting the appointment of a trustee, including, but not limited to, (i) the Debtor's failure to timely file monthly operating reports; (ii) the Debtor's failure file amended Schedules; (iii) the Debtor's failure to file tax returns; (iv) various issues relating to the Debtor's proposed plan and disclosure statement; and (v) the clear and intense acrimony between the Debtor and Keiser (ECF Doc. No. 268).

On October 9, 2018, Ronald J. Friedman, Esq., was appointed as the chapter 11 operating Trustee for LSI. (ECF Doc. No. 281). The Trustee retained SilvermanAcampora LLP for his counsel (ECF Doc. No. 285). Trustee additionally retained employ Kroll Associates, Inc. as accountant for the Trustee (ECF Doc. No. 294).

> 8.      *Compensation for Shipman & Goodman LLP.*

During a hearing on August 7, 2018, Shipman & Goodman argued for allowance of compensation and reimbursement of expenses (ECF Doc. No. 297). The Trustee and United States Trustee objected to this motion and scheduled another hearing for December 19, 2018 (ECF Doc. No. 298). The Trustee objected to full payment and proposed postponing the Fee

HTRUST/2369879.1/067797

Application with an interim payment of $50,000 to a later date (ECF Doc. No. 301). The
Bankruptcy Court confirmed this proposal on December 20, 2018 (ECF Doc. No. 302).

### 9.    *Turnover and Sale of Unnecessary Vehicles.*

As discussed above, the Debtor owned vehicles which were unnecessary to the continued
operations of the Debtor's business.  The Trustee successfully recovered the proceeds from the
sale of two (2) of the three (3) classic VW Vans consigned to Hollywood Motors by William
Frey, which were on March 28, 2018 and April 3, 2018, respectively.  Hollywood Motors turned
over the third classic VW Van to the Trustee to be sold. On Apr 2, 2019, the Trustee filed a
Notice to Creditors and Other Parties in Interest of Trustee's Intended Sale (ECF Doc. No. 311).
The Trustee intended to sell three (3) of the Debtor's vehicles, a 2013 GMC van, a 2013 Isuzu
NPR, and a 2014 Chevrolet van. Maltz Auctions Inc. *d/b/a* Maltz Auctions (the "*Trustee's
Auctioneer*") would be conducting the sale, gave notice of the location and date of the sale, and
provided instructions for objecting to the sale. On April 23, 2019, the Trustee filed a second
notice of sale regarding the sale of the Debtor's personal property, specifically a 1974
Volkswagen Van (ECF Doc. No. 316).  The Trustee's Auctioneer then sold the remaining VW
Van and the three (3) vehicles used in the Debtor's operations at public auctions held on April
30, 2019 and May 21, 2019, respectively. The proceeds from the sale of the six (6) vehicles
totaled $89,150.00.  The Trustee later applied for reimbursement of the expenses relating to the
sale (ECF Doc. No. 331), which the Bankruptcy Court granted on August 5, 2019 (ECF Doc. No.
344).

### 10.    *FRBP 2004 Examinations.*

The Debtor filed a number of applications for examination and document production
under Bankruptcy Rule 2004 in an effort to obtain information relating to the administration of
the Bankruptcy Case and for the purpose of determining potential claims for recovery of assets to
be used by the Debtor's estate to be distributed to Creditors. The subject of these examinations
are: Richard Keiser, Scott Paterniani, Zack Gray, Crius Energy Trust, Faber Daeufer & Irato
P.C., Novogradac & Co LLP, Sorenson Capital, Embark Corporation, Trinity Solar, Venture
Solar, Vivint Solar, Inc., Firstar Development, LLC, NuMaMe, LLC, Harvest Power LLC, Long
Island Power Solutions, Inc., Greenleaf Solar LLC, Sunrun Solar Electrical Corporation, and
LGCY Power, LLC, (ECF Doc. Nos. 39-56). Crius Energy Trust agreed to voluntarily produce
the documents requested in the examination application. The examination applications for
Harvest Power LLC and Venture Solar were granted March 12, 2018 (ECF Doc. Nos. 109-110).
The examination applications for LGCY Power LLC, Faber Daeufer & Irato P.C., Trinity Solar
LLC, Long Island Power Solutions, Inc., Scott Paterniani, Embark Corporation, and Vivint
Solar, Inc. were granted on March 13, 2018 (ECF Doc. Nos. 111-117). The examination
application for Sunrun Solar Electrical Corporation was granted on April 17, 2018 (ECF Doc.
No. 155). The examination applications for Firstar Development, LLC and NuMaMe, LLC were
granted on April 18, 2018 (ECF Doc. Nos. 156-157). The examination application for
Novogradac & Co LLP was granted on March 30, 2018 (ECF Doc. No. 162). The examination
application for Zack Gray was granted on July 26, 2018 (ECF Doc. No. 212). The examination
application for Richard Keiser was granted on August 23, 2018 (ECF Doc. No. 235).

HTRUST/2369879.1/067797

The Trustee also filed multiple applications for examination and document production under Bankruptcy Rule 2004. The subjects of these examinations are: Christian Von Hassell, Google LLC (by an Officer, Director, or a Managing Agent with Knowledge of Email Accounts relating to the Debtor), Christopher A. Hunter, Ardavan Metghalichi (ECF Doc. Nos. 318-21). These examination applications were granted on June 20, 2019 (ECF Doc. Nos. 336-39). The Trustee filed an application for an examination and document production under Bankruptcy Rule 2004 Embark Home LLC, which was submitted on presentment to the Bankruptcy Court on November 1, 2019 and is pending before the Bankruptcy Court (ECF Doc. No. 359).

> 11.    *Insurance.*

Nationwide provided a Bond of Operating Trustee Bond, Bond No. SNN 4009283, for $800,000 (ECF Doc. No. 282). On May 16, 2019, this bond was increased to $873,000 (ECF Doc. No. 322).

> B.    *Non-Bankruptcy Litigation*.

The Debtor was a party to non-Bankruptcy Court, pre- and post-petition actions. The following are summaries of those actions:

> 1.    *Daniel Corey Hiergesell and Dennise Esperanza Flores v. Level Solar, Inc.*

This a class action filed by two former LSI employees seeking recovery on behalf of themselves and similarly situated former employees for damages allegedly incurred under the New York Warn Act in the Supreme Court of the State of New York, County of New York. The state court action was stayed upon the filing of this Bankruptcy Case and was transferred to the Bankruptcy Court.  As discussed below in item C.1, this action was settled on June 26, 2019.

> 2.    *Sonepar Distribution New England, Inc., d/b/a North East Electrical Distributors v. Level Solar, Inc.*

This was a replevin action by one provider of solar panels to LSI resolved by voluntarily allowing the provider to enter LSI's warehouse and recover its solar panels.

> 3.    *Grokash Realty Associates, LLC v. Level Solar, Inc.*

One of LSI's landlords filed two relatively identical petitions to have LSI determined a "holdover tenant" after it sent LSI notices to quit. The Debtor resolved one of those matters by simply turning over the property. The other was resolved at trial by entry into a settlement agreement LSI was compelled to execute under duress and intends to reject. Nevertheless, LSI removed its property from this property and tendered the space back to the landlord.

> 4.    *In re Comeau, Jeffrey.*

This was a "Consumer Frauds claim" filed by a homeowner because he was not aware

who would be serving his solar arrays after LSI terminated its employees in September 2017. It was resolved once the State of New York, Office of the Attorney General, realized the SUNation Service had been engaged to handle serving this solar array.

5.    *New York State Department of Labor Investigation.*

This was an investigation into the same potential New York WARN Act violations that are the subject of item 1, above. Based on its investigation, the New York Department of Labor filed a proof of claim on behalf of the Debtor's former employees. This claim was withdrawn on July 8, 2019 (ECF Doc. No. 340).

6.    *Ung, Siha v. Workers' Compensation Trust Fund Board.*

This is a worker's compensation case filed by a former employee of LSI that fell of a roof while installing a solar array. LSI assisted in this matter regarding the circumstances of the accident and the losses sustained by its former employee. The Debtor is not currently aware of the outcome.

7.    *David C. Neiger v. Level Solar, et. al.*

This was an attempt by David Neiger, a former employee of LSI, to collect his proof of claim amount in a non-bankruptcy court, post-petition. A motion to dismiss is pending.

C.    *Bankruptcy Litigation.*

The Debtor has been or is party Bankruptcy Court actions. The following is a summary of those actions:

1.    *Daniel Corey Hiergesell and Dennise Esperanza Flores v. Level Solar, Inc. (the WARN Act Claim).*

This Adversary Proceeding was filed because the state court matter, described in item B.1., above, was stayed upon the filing of the Case. As with the state court case, two former LSI employees filed this class action seeking recovery on behalf of themselves and similarly situated former employees for damages allegedly incurred under the New York Warn Act. On June 26, 2019, the Bankruptcy Court entered a final order pursuant to Rule 23 of the Federal Rules of Civil Procedure and Bankruptcy Rule 9019 approving the class action settlement providing Plaintiff an Allowed Class 1 Claim for $400,000 and class counsel's request for fees and costs (Case No. 18-01012 (MKV) ECF Doc. No. 32).

2.    *Ronald J. Friedman, Esq., as Chapter 11 Operating Trustee of the Estate of Level Solar Inc. v. Long Island Industrial Management LLC.*

This Adversary Proceeding was commenced on December 12, 2019 against Long Island Industrial Management LLC under chapter 5 of the Bankruptcy Code to avoid the pre-petition transfer of property to Long Island Industrial Management LLC in the amount of $8,819.81

22

(Adv. Pro. Case No. 19-01438 (RG)).  Long Island Industrial Management LLC filed an answer to the complaint on January 2, 2019 (Adv. Pro. Case No. 19-01438 (RG) ECF Doc. No. 6).  This matter will go forward at a pre-trial conference scheduled for February 18, 2020.

> 3.    *Ronald J. Friedman, Esq., as Chapter 11 Operating Trustee of the Estate of Level Solar Inc. v. Electrical Inspectors, Inc.*

This Adversary Proceeding was commenced on December 12, 2019 against Electrical Inspectors, Inc. under chapter 5 of the Bankruptcy Code to avoid the pre-petition transfer of property to Electrical Inspectors Inc. in the amount of $8,580.00 (Adv. Pro. Case No. 19-01439 (RG)).  In an effort to resolve this Adversary Proceeding, the Trustee and Electrical Inspectors Inc. engaged in negotiations and settled this matter in the amount of $4,290.00 in order to amicably resolve this matter in an effort to avoid the risks and costs associated with the continued litigation of this matter.  The Trustee filed a motion pursuant to Bankruptcy Rule 9019 seeking the entry of an order approving a stipulation of settlement between the Trustee and Electrical Inspectors Inc.  ((Adv. Pro. Case No. 19-01439 (RG) ECF Doc. No. 10).  The Court will hold a hearing on this matter on March 31, 2020.

> 4.    *Ronald J. Friedman, Esq., as Chapter 11 Operating Trustee of the Estate of Level Solar Inc. v. Quick Mount PV*

This Adversary Proceeding was commenced on December 12, 2019 against Quick Mount PV under chapter 5 of the Bankruptcy Code to avoid the pre-petition transfer of property to Quick Mount PV in the amount of $29,280.95 (Adv. Pro. Case No. 19-01440 (RG)).  In an effort to resolve this Adversary Proceeding, the Trustee and Quick Mount PV engaged in negotiations and settled this matter in the amount of $20,000.00 in order to amicably resolve this matter in an effort to avoid the risks and costs associated with the continued litigation of this matter.  The Trustee filed a motion pursuant to Bankruptcy Rule 9019 seeking the entry of an order approving a stipulation of settlement between the Trustee and Quick Mount PV.  ((Adv. Pro. Case No. 19-01440 (RG) ECF Doc. No. 9).  The Court will hold a hearing on this matter on March 31, 2020.

> 5.    *Ronald J. Friedman, Esq., as Chapter 11 Operating Trustee of the Estate of Level Solar Inc. v. Prontotype*

This Adversary Proceeding was commenced on December 12, 2019 against Prontotype under chapter 5 of the Bankruptcy Code to avoid the pre-petition transfer of property to Prontotype in the amount of $25,055.00 (Adv. Pro. Case No. 19-01441 (RG)).  Prontotype has not filed a response to the Trustee's complaint to date.  This matter will go forward at a pre-trial conference scheduled for February 18, 2020, where the Trustee will seek to move for a default judgment against Prontotype.

> 6.    *Ronald J. Friedman, Esq., as Chapter 11 Operating Trustee of the Estate of Level Solar Inc. v. Maypole Environmental Inspections, LLC*

This Adversary Proceeding was commenced on December 12, 2019 against Maypole Environmental Inspections, LLC under chapter 5 of the Bankruptcy Code to avoid the pre-

HTRUST/2369879.1/067797

petition transfer of property to Maypole Environmental Inspections, LLC in the amount of $7,938.00 (Adv. Pro. Case No. 19-01442 (RG)).    The Trustee has extended Maypole Environmental Inspections, LLC's time to respond to the Trustee's complaint to February 18, 2020.    The Trustee and Maypole Environmental Inspections, LLC are currently engaged in settlement negotiations.    This matter will go forward at a pre-trial conference scheduled for February 18, 2020

ARTICLE III
THE PLAN OF REORGANIZATION

**THE FOLLOWING IS A SUMMARY OF THE PROVISIONS OF THE PLAN AND, ACCORDINGLY, IS NOT AS COMPLETE AS THE FULL TEXT OF THE PLAN THAT ACCOMPANIES THIS DISCLOSURE STATEMENT. THE PLAN ITSELF, ATTACHED HERETO AS EXHIBIT A, SHOULD BE READ IN ITS ENTIRETY.**

A.    *Summary of Payment Provisions of the Plan.*

1.    *Impairment of Claims and Interests.*

Under the Bankruptcy Code, a class of claims or interests is deemed "impaired" under a plan of reorganization unless the rights of the holders of the claims or interests in the class are not altered or, regarding interests, the holders receive cash equal to the greater of (i) any liquidation preference or (ii) the redemption price, if either applies.

Any class deemed impaired must accept the plan by the requisite majority before the plan can be confirmed, unless the Bankruptcy Court finds, under Bankruptcy Code section 1129(b), that the plan is fair and equitable and does not discriminate unfairly with respect to each impaired class that has not accepted the plan.

2.    *Treatment of Claims and Equity Interests.*

The treatment of and consideration to be received by holders of Allowed Claims and Equity Interests under the Plan will be in full settlement, release and discharge of their respective Allowed Claims or Equity Interests relating to the Debtor and other Persons specified in the Plan.

B.    *Claims and Interests.*

The Plan divides the Claims against and Equity Interests in the Debtor into various Classes and designations. These are described below along with a summary of their corresponding treatment under the Plan. Reference is made to "Summary of Distributions Under the Plan" above.

1.    *Allowed Administrative Claims.*

Allowed Administrative Expense Claims (other than Professional Fee Claims), including United States Trustee Fees, will be paid in full, in cash, or on less favorable terms to which the

24

Trustee and the claimant agree, on the later of the Effective Date or ten business days after the Administrative Expense Claim is Allowed, except that Administrative Expense Claims the Debtor incurs in the ordinary course of business may be paid at any time. By the Effective Date, the Trustee shall pay all United States Trustee Fees due through the Effective Date. Post-petition taxes will be paid when due. Substantial Contribution Claims must be Filed by the Professional Fee Claims Bar Date.

All requests for payment of Administrative Expense Claims to be Filed and served by the forty-fifth (45th) Business Day after the Effective Date. The Trustee or the LSI Liquidating Trustee shall establish the Administrative Expense Claims Reserve for the payment of Administrative Expense Claims which have not been Allowed as of the Effective Date. Any Entity required to File and serve such a request but fails to timely do so will be forever barred, estopped, and enjoined from asserting its request or Claim against the Trustee, the Debtor, the Estate, the Trusts or their beneficiaries, or any of its or their property. This provision will not be construed to extend any earlier Bar Date.

2.    *Professional Fee Claims.*

No later than the Professional Fee Claims Bar Date, the Trustee and each Professional employed during the Case must File a final application for allowance and payment of its Professional Fee Claim and serve notice of its application on all parties entitled to notice in the Case. Failing to timely File a final fee application will cause the related Professional Fee Claim being forever barred. A Professional Fee Claim regarding which an application is properly Filed will become Allowed only to the extent approved by a Final Order. On the Confirmation Date, the engagements of all Professionals employed by the Debtor will terminate.

3.    *Priority Tax Claims.*

At the Trustee's option, each Holder of an Allowed Priority Tax Claim either will be paid its full Allowed Priority Tax Claim in Cash (a) on the later of the Effective Date or the first Business Day after its Claim is Allowed, or (b) in equal quarterly installments with interest at the rate required by law beginning on the Effective Date and ending on the date six (6) years after the Priority Tax Claim was assessed.

4.    *Class 1 – Priority Claims.*

Allowed Priority Claims will be paid their Allowed amount in Cash on the later of the Effective Date or ten days after an Order allowing the Claim becomes a Final Order. This Class is not Impaired.

5.    *Class 2A – New York Green Bank Claim.*

Until the Green Bank Debt is paid in full, New York Green Bank will (i) be entitled to receive all distributions on account of the Debtor's Master Holdings Interest, (ii) shall have a non-recourse lien against all of those distributions, secured only by the Master Holdings Interest pursuant to a pledge thereof granted by the Reorganized Debtor, and (iii) continue to maintain all

25

of its rights against Master Holdings and all of the assets of Master Holdings under the Green Bank Loan Documents. Nothing contained in this Plan shall affect in any way any of the rights of New York Green Bank pursuant to the Green Bank Loan Documents except that, on the Effective Date, the Debtor's guaranty of Master Holdings' obligations under the Green Bank Loan Documents shall be released and the Reorganized Debtor shall not be liable to New York Green Bank for anything other than the Reorganized Debtor's Master Holdings Interest to be delivered to New York Green Bank until the Green Bank Debt is paid in full. This Class is Impaired.

> 6.    *Class 2B – Cooper Electric Secured Claim.*

The Holder of Claim No. 35, filed by Cooper Electric as a Secured Claim in the amount of $4,840,947.18, shall be Allowed as follows: (i) an Allowed Secured Claim in the amount of $820,000 which shall receive a Distribution of cash in the amount of $820,000 on the Effective Date, and (ii) an Allowed Class 4 General Unsecured Claim in the amount of $1,530,000.[8] This Class is Impaired.

> 7.    *Class 3 – Convenience Claims.*

Allowed Convenience Claims will be paid twenty percent of their Allowed amount in Cash on the later of the Effective Date or ten days after an Order allowing the Claim becomes a Final Order. This Class is Impaired.

> 8.    *Class 4 - General Unsecured Claims.*

Allowed General Unsecured Claims will receive their Pro Rata share (based on the Allowed amount of their Class 4 Claims) of LSI Liquidating Trust Certificates. This Class is Impaired.

> 9.    *Class 5 – Preferred Equity Interests.*

All existing Preferred Equity Interests will be cancelled and their Holders will receive nothing of value under the Plan. This Class is impaired, but will not vote because under Bankruptcy Code section 1129(g) it is deemed to have rejected the Plan.

> 10.    *Class 6 - Common Equity Interests.*

---

[8] The resolution of Cooper Electric's Secured Claim under the Plan constitutes a good faith compromise and settlement between the Trustee and Cooper Electric pursuant to Bankruptcy Code §1123(b)(3)(A) and Bankruptcy Rule 9019(a). Cooper Electric's Secured Claim filed its Proof of Claim for goods sold pursuant to a consignment agreement, which was perfected by five (5) UCC-1 financing statements filed on February 15, 2017 and March 28, 2017. The Debtor listed Cooper Electric as a Secured Creditor in its bankruptcy petition with an unknown amount, listing the value of the collateral supporting the claim as $0.00, and listing the claim as unliquidated and disputed. After extensive negotiations between the Trustee and Cooper Electric, the parties reached a settlement resulting in a reduction of Cooper Electric's claim as set forth above. The Trustee, in his business judgment, believes the settlement saves the Debtor and its Estate the costs and expenses of litigation, the outcome of which is likely to consume substantial resources of the Debtor's Estate and require substantial time to adjudicate. The benefits the Debtor's Estate, stakeholders, and all parties in interest from the Cooper Electric settlement are obvious.

HTRUST/2369879.1/067797

All existing Common Equity Interests will be cancelled and their Holders will receive nothing of value under the Plan. This Class is impaired, but will not vote because under Bankruptcy Code section 1129(g) it is deemed to have rejected the Plan.

      C.      *Other Provisions of the Plan.*

      1.      *Monetization of Debtor's Assets.*

Before the Effective Date, the Trustee will monetize as much of the Debtor's assets as is practicable so that, with the Pell-QED Contribution, there will be sufficient cash available to (i) fund the Disputed Claim Reserve, the Administrative Expense Claim Reserve, and the Professional Fee Reserve, (ii) pay on the Effective Date the Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Claims, the Allowed Secured Claim of Cooper Electric, and Allowed Convenience Class Claims, and (iii) establish reserves to pay any Disputed Administrative Expense Claims, Disputed Priority Tax Claims, Disputed Priority Claims, and Disputed Convenience Class Claims if they become Allowed; and (iii) adequately fund the reasonable and necessary projected costs to carry out the Plan's provisions on and after the Effective Date.

      2.      *Pell-QED Contribution.*

On the Effective Date, Lisa Pell and QED, LLC[9] will deliver to the Trustee the Pell-QED Contribution in exchange for (i) 100% of the Equity Interests in the Reorganized Debtor, (ii) the retained LSI Intellectual Property, (iii) the Tax Rights, (iv) subject to the prior rights of (a) New York Green Bank under Section 4.02 and (b) the LSI Liquidating Trust to receive all distributions from Level Solar Master Holdings I, LLC until all amounts payable on account of LSI Liquidating Trust Certificates have been paid in full, the Debtor's Master Holdings Interest, and (v) the releases described in section 10.06 of this Plan.

      3.      *Pell-QED Advance.*

On the Effective Date, Lisa Pell and QED, LLC will deliver to the Trustee the Pell-QED Advance, which will accrue interest at 4.0% annually and be repaid as an expense of the LSI Liquidating Trust's administration, as and when funds are available to the LSI Liquidating Trust.

      4.      *Establishment of and Transfers to LSI Liquidating Trust.*

On the Effective Date, the LSI Liquidating Trust will be established under Treasury Regulation section 301.7701-4(d) to hold the Trust Assets (defined below) and facilitate their liquidation and monetization to benefit the Beneficiaries entitled to them. The LSI Liquidating Trust will assume any obligations of the Estate or the Trustee to administer the Plan, including the obligation to manage any Reserve and to prosecute any Claims objections or litigation.

After the Trustee has made the Distributions called for under Section 6.01, the balance of

---

[9] Lisa Pell is the wife of Richard Pell, the former Secretary of the Debtor. William Frey was the former President and Chief Executive Officer of the Debtor and is the Managing Member of QED, LLC.

HTRUST/2369879.1/067797

the tangible and intangible rights, assets, and properties of the Debtor and the Estate, including any claims held derivatively, will be transferred to the LSI Liquidating Trust. The LSI Liquidating Trustee will establish and maintain the Disputed Claims and Interest Reserves by allocating to them, to benefit Holders of Disputed Claims or Interests, an appropriate portion of the Certificates (or Cash, if available) to be issued or paid to each Holder of a Disputed Claim or Interest under the Plan when its Claim or Interest becomes Allowed.

The LSI Liquidating Trust Agreement will provide for the establishment as soon after the Effective Date as is practicable of an LSI Liquidating Trust Board (the "Trust Board") comprising the LSI Liquidating Trustee and two (2) other Persons. One Trust Board member will be designated by the Holder of the highest percentage of Allowed Class 4 General Unsecured Claims as of the Effective Date. Another Trust Board member will be designated by the Holder of the second highest Allowed Class 4 General Unsecured Claim as of the Effective Date. If a vacancy exists on the Trust Board which no designated candidate is available to fill, the LSI Liquidating Trustee, in consultation with the remaining Trust Board members, will designate a natural Person to fill the vacancy. The LSI Liquidating Trust Agreement will specify when Trust Board approval is necessary for the LSI Liquidating Trust to act. If a tie vote of the Trust Board occurs as to any action that requires Trust Board approval, the LSI Liquidating Trustee's vote will control. The LSI Liquidating Trustee may cause the Trust to utilize the services of third parties. The LSI Liquidating Trust will indemnify and hold the Estate and the Released Parties harmless from all liabilities, damages, losses, costs and expenses, including defense costs and legal fees, arising from any Claims against or Interests in the Debtor.

The LSI Liquidating Trust Agreement will provide generally that after expenses of administration are paid or reserved, LSI Liquidating Trust Certificates will be paid *pari passu* and *Pro Rata* from the first Cash distributed by the LSI Liquidating Trust until the amounts payable on account of LSI Liquidating Trust Certificates have been paid in full, whereupon all remaining LSI Liquidating Trust Assets will be turned over to the Reorganized Debtor.

5.     *Discharge of the Trustee.*

Upon the Effective Date, the Trustee shall be relieved and discharged of all duties with respect to the Case and the Estate.

6.     *Distributions.*

All distributions and transfers to be made under the Plan will be made by the Trustee or the LSI Liquidating Trustee in accordance with Article VIII of the Plan.

7.     *Causes of Action.*

After the Effective Date, the LSI Liquidating Trustee shall have the sole right, in the name of the Debtor's estate, to commence, continue, or settle any Causes of Action, including any Causes of Action brought by the Debtor or Trustee before the Effective Date.

**PARTIES IN INTEREST, INCLUDING CREDITORS, MAY NOT RELY UPON**

28

**THE ABSENCE OF A REFERENCE IN THE DISCLOSURE STATEMENT OR PLAN AS AN INDICATION THAT THE TRUSTEE OR THE LSI LIQUIDATING TRUSTEE WILL NOT PURSUE ANY AND ALL AVAILABLE CAUSES OF ACTION AGAINST THEM. THE DEBTOR'S ESTATE EXPRESSLY RESERVES THE RIGHT TO PROSECUTE ANY AND ALL CAUSES OF ACTION AGAINST THIRD PARTIES (WHETHER OR NOT REFERENCED IN THE DISCLOSURE STATEMENT OR PLAN), INCLUDING, WITHOUT LIMITATION, AVOIDANCE AND SUBORDINATION ACTIONS AGAINST ANY CREDITOR.**

8.    *Objections to Claims.*

Except as the Plan otherwise provides or as may be extended by the Bankruptcy Court, the Trustee or the LSI Liquidating Trustee will file all objections to Claims or Interests by the later of (i) ninety (90) days after the Effective Date, (ii) sixty (60) days after a particular Proof of Claim or Interest is Filed, or (iii) a date the Bankruptcy Court may fix. The Bankruptcy Court will retain jurisdiction to rule on any Claim or Interest as to which a timely objection has been Filed. All objections to Claims of insiders or their Affiliates will be Filed before the Effective Date and, to the extent not adjudicated as of the Effective Date, will be prosecuted by the LSI Liquidating Trustee.

Notwithstanding any other provision, no Distribution will be made to the Holder of a Disputed Claim or Interest or to the Holder of a Claim or Interest who is the subject of a proceeding against it by the Trustee or by the LSI Liquidating Trustee, unless the Disputed Claim or Interest becomes an Allowed Claim or Interest. The Trustee will establish Disputed Claims Reserves to comply with the Plan or any Order regarding Classes of Claims to be paid on the Effective Date. Those Reserves will be transferred to the LSI Liquidating Trust. The LSI Liquidating Trustee will establish and maintain all other Reserves for Disputed Claims and Interests to receive LSI Liquidating Trust Certificates under the Plan.

9.    *Executory Contracts.*

All Executory Contracts between the Debtor and any Entity not assumed or rejected before the Effective Date and are not as of the Effective Date the subject of a pending application to assume or reject or extend time to assume or reject will be deemed rejected as of the Effective Date. Nothing in the Plan constitutes a waiver of any claim, right, or Cause of Action the Debtor or the Trustee may hold against any party to any Executory Contract, including any insurer under any insurance policy.

All unexpired leases between the Debtor and any Entity not assumed or rejected before the Effective Date and are not as of the Effective Date the subject of a pending application to assume or reject or extend time to assume or reject will be deemed rejected as of the Effective Date. Nothing in the Plan constitutes a waiver of any claim, right, or Cause of Action the Debtor or the Trustee may hold against any lessor or lessee.

When the Plan calls for an Executory Contract or unexpired lease to be assumed or rejected, the Confirmation Order's Entry will constitute that approval under Bankruptcy Code

HTRUST/2369879.1/067797

section 365(a). All Proofs of Claim arising out of an Executory Contract or unexpired lease's rejection under this Article 9 must be Filed within thirty (30) days after the later of the Confirmation Date or the date on which the Bankruptcy Court enters an Order approving the rejection. Any Holder of a Claim arising out of the rejection of an Executory Contract or unexpired lease who fails to File a Proof of Claim within that time will be forever barred, estopped, and enjoined from asserting that Claim against the Debtor, the Estate, or the LSI Liquidating Trust. Unless the Bankruptcy Court orders otherwise, all Claims arising from the rejection of Executory Contracts and unexpired leases will be treated under the Plan as General Unsecured Claims. Nothing in the Plan extends the time for Filing a Proof of Claim related to a contract or lease rejected before the Confirmation Date.

10.    *Releases, Exculpation and Injunctions.*

To the extent permitted under section 1125(e) of the Bankruptcy Code, under the Plan and the Confirmation Order, none of the Exculpated Parties will have any liability to any Creditor, Interest Holder, or other Person for any act or omission related to or arising out of the Case's administration, including the negotiation, preparation, and pursuit of Confirmation of the Plan, or the Plan's confirmation and consummating, or the administration of property to be Distributed under the Plan, except for willful misconduct, gross negligence, criminal conduct, misuse of confidential information that causes damages, or ultra vires acts and, in all respects, Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. Nothing in this Section shall (i) be construed as a release of any entity's fraud, gross negligence, malpractice, or willful misconduct with respect to matters in connection with the Plan (ii) limit the liability of the professionals of the Exculpated Parties to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

EXCEPT AS THE PLAN OR THE CONFIRMATION ORDER EXPRESSLY PROVIDES, FROM THE EFFECTIVE DATE ALL PERSONS WHO HAVE BEEN, ARE, OR MAY BE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR ARISING BEFORE THE EFFECTIVE DATE WILL BE ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS WITH RESPECT TO THOSE CLAIMS OR INTERESTS:

(1)    COMMENCING, CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION, OR PROCEEDING OF ANY KIND AGAINST THE TRUSTEE, THE DEBTOR, OR THE ESTATE, INCLUDING SUITS, ACTIONS, AND PROCEEDINGS THAT ARE PENDING AS OF THE EFFECTIVE DATE, WHICH WILL BE WITHDRAWN OR DISMISSED WITH PREJUDICE BASED UPON OR ARISING FROM THEIR CLAIMS AGAINST THE DEBTOR;

(2)    ENFORCING, LEVYING, ATTACHING, COLLECTING, OR OTHERWISE RECOVERING IN ANY WAY, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTOR OR THE ESTATE;

(3)    CREATING, PERFECTING, OR OTHERWISE ENFORCING IN

HTRUST/2369879.1/067797

ANY WAY, DIRECTLY OR INDIRECTLY, ANY LIEN AGAINST THE DEBTOR OR THE ESTATE;

(4)    ASSERTING ANY RIGHT OF SUBROGATION, SETOFF, OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE THE DEBTOR OR THE ESTATE;

(5)    PROCEEDING IN ANY WAY IN ANY PLACE THAT DOES NOT CONFORM TO OR COMPLY WITH THE PLAN.

AS OF THE EFFECTIVE DATE, WITH NO FURTHER ACTION, THE DEBTOR AND THE ESTATE WILL BE DEEMED TO HAVE RELEASED THE RELEASED PARTIES FROM ALL RELEASED CLAIMS.

11.    *Miscellaneous.*

(a)    *Retention of Jurisdiction.*

Notwithstanding the Confirmation Order being entered, the Effective Date occurring, or the Plan being consummated, the Bankruptcy Court will retain jurisdiction post-confirmation to the full extent legally permissible, including jurisdiction to ensure the Plan's provisions are carried out. The Bankruptcy Court will also retain jurisdiction post-confirmation for these specific purposes:

(i)    to adjudicate any controversy about the classification, value, allowance, or estimation of any Claim, any related counterclaim, or Interest;

(ii)    to liquidate, allow, or disallow any disputed, contingent, or unliquidated Claim;

(iii)    to rule on any application for compensation, expense reimbursement, and any fees authorized to be paid or reimbursed under the Bankruptcy Code or the Plan;

(iv)    to adjudicate all contested matters and adversary proceedings pending on the Effective Date, including motions to reject, assume, or assume and assign Executory Contracts or unexpired leases to which the Debtor is a party or regarding which it may be liable, and to adjudicate, and if need be liquidate, all Claims arising from them;

(v)    to adjudicate all Causes of Action, including all Avoidance Actions and all Preserved Estate Claims, and to rule on all proposed compromises and settlements of them;

(vi)    to consider any modification to the Plan, remedy any ambiguity, defect or omission, and to reconcile any conflict between the Confirmation Order and any other Order;

HTRUST/2369879.1/067797

(vii)     to adjudicate all controversies, suits, and disputes that may arise in connection with the Plan's interpretation, enforcement, or consummation;

(viii)     to issue orders in aid of the Plan's execution under Bankruptcy Code section 1142;

(ix)     to determine all other matters which may arise in connection with the Plan or the Confirmation Order; and

(x)     to enforce the releases and injunctions the Plan grants and establishes.

(b)     *Plan Supplement; Effectuating Documents.*

A Plan Supplement may include a schedule of known Causes of Action over which jurisdiction is specifically retained, but failing to specifically identify a Cause of Action on such schedule will not deprive the Bankruptcy Court of jurisdiction to hear and consider the Cause of Action.

To effectuate and further evidence the Plan's terms, the Trustee may execute, deliver, File, or record all contracts, instruments, releases, and other agreements or documents, and to take all necessary actions. All transactions the Plan requires to occur on the Effective Date will be deemed to have occurred simultaneously.

(c)     *Conditions Precedent to Plan's Effectiveness.*

Each of these conditions must occur and be satisfied by the Effective Date for the Plan to be confirmed and effective: (i) The Confirmation Order shall have been entered, shall not have been modified or altered and no stay of the Confirmation Order shall be in effect; and (ii) all actions, documents, and agreements necessary to implement the Plan and the transactions it contemplates will have been effected or executed, except to the extent waived in writing.

ARTICLE IV
PLAN CONFIRMATION

A.     *Feasibility.*

Bankruptcy Code section 1129(a) requires a judicial determination that the Plan's Confirmation will not likely be followed by liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor under the plan, unless liquidation is contemplated under the plan.

The Proponents are confident that Claimants will receive greater recoveries under the Plan than they would if this case were converted to one under chapter 7 of the Bankruptcy Code. The Proponents are also confident that the LSI Liquidating Trust will have sufficient funds on hand to satisfy the distributions required under Bankruptcy Code section 1129(a)(9) and the Trustee's obligations under the Plan, and to carry on its purpose.

32

Creditors and holders of Equity Interests are advised to consult Exhibit C, which contains a liquidation analysis (the "*Liquidation Analysis*") comparing the estimated recoveries of interested parties under both the Plan and a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.

B.      *Acceptance*.

As a condition to Plan Confirmation, Bankruptcy Code section 1129(a), with certain exceptions, requires that each impaired Class accept the Plan. In general, a class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturities or by payment in full in cash.

The Bankruptcy Code defines acceptance of a plan (a) by a class of creditors entitled to vote thereon as acceptance by holders of two-thirds in dollar amount and a majority in number of Allowed Claims in that class and (b) by a class of equity holders entitled to vote thereon by acceptance of two-thirds in amount of such interests. Each calculation, however, includes only those holders of Allowed Claims and Equity Interests who actually vote to accept or reject the Plan. Under Bankruptcy Code section 1126(f), classes of Claims and Equity Interests that are not "impaired" under a plan are conclusively deemed to have accepted the plan.

Under Bankruptcy Code section 1126(g), classes that receive no distributions under a plan are conclusively deemed to have rejected the plan. Due to the uncertainty of a full recovery of any Class described in the Plan, all Claims against the Debtor are impaired. A claim or interest is in a particular Class only to the extent it qualifies within the definition of such Class and is in a different Class to the extent it qualifies within the definition of such different Class.

C.      *Non-Acceptance and Cram Down*.

If any Class of impaired Claims fails to accept the Plan, the Proponents will seek to effect a "cram down" on such dissenting Class and all Classes junior to such dissenting Class under Bankruptcy Code section 1129(b). The Proponents also reserve the right to amend the Plan and request the Bankruptcy Court to confirm the Plan as further amended. If an amendment or amendments to the Plan are material, the Proponents may have to re-solicit acceptances from any Class hurt by the change(s), unless that Class can be deemed to have accepted or rejected the Plan.

If a Holder of an Allowed Unsecured Claim votes to reject the Plan, they are entitled to be paid the full amount of their Allow Unsecured Claim prior to any distribution made to Holders of Interests.

D.      *Best Interests Test – Liquidation Analysis*.

Notwithstanding acceptance of the Plan under Bankruptcy Code section 1126, the Court must find that if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or

HTRUST/2369879.1/067797

retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. The Proponents believe that the Plan complies with this "best interests" test. As discussed below and demonstrated in the Liquidation Analysis, a conversion of the Case to a case under chapter 7 of the Bankruptcy Code, followed by liquidation under chapter 7, would engender higher expenses and risks than the reorganization contemplated by the Plan. When coupled with the inevitable delay caused by the appointment of a chapter 7 trustee and the retention of the trustee's professionals, distribution to holders of Allowed Claims necessarily will be delayed for an indefinite period.

A conversion of the Case to a case under chapter 7 of the Bankruptcy Code would require the appointment of a trustee to liquidate the Debtor. Such a trustee would likely have limited historical experience or knowledge of the Case or of the Debtor's records, assets or former business. The fees charged by a chapter 7 trustee and any professionals hired by the chapter 7 trustee could impose additional administrative costs on the Debtor's estate not incurred under the Plan and which will be paid ahead of Allowed Administrative, Other Priority Claims Priority Tax and General Unsecured Claims. Likewise, there will be no Pell-QED Contribution or Pell-QED Advance, and therefore there is no guarantee that Allowed Administrative, Other Priority Claims Priority Tax will be paid in full.

The Liquidation Analysis reveals that confirmation of the Plan is preferable to a liquidation under chapter 7 of the Bankruptcy Code because creditors will receive more under the Plan than they would receive in a chapter 7 liquidation by preserving the going-concern value of the Debtor and its assets. Further, conversion of the case to a later chapter 7 case would occasion substantial delay associated with the trustee and its professionals educating themselves as to the particularities of the Debtor's estate and unique business assets. The Plan provides an efficient mechanism for prompt and subsequent periodic distributions to holders of Allowed Claims that would not exist in a chapter 7 liquidation. The value of the liquidation proceeds would be further reduced by the time value of money.

For all the foregoing reasons, the Proponents believe that the Plan is in the best interests of Creditors and Equity Interest holders and also complies with the statutory requirements of the Bankruptcy Code.

## ARTICLE V
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The tax consequences to holders of claims and equity interests may vary based upon the individual circumstances of each holder. The tax consequences of certain aspects of the plan are uncertain due to the lack of applicable legal precedent and the possibility of changes in the tax law.

No ruling has been applied for or obtained from the IRS regarding the tax aspects of the plan and no opinion of counsel has been requested or obtained by the debtors with respect thereto.

34

This discussion does not constitute tax advice or a tax opinion about the matters described. No representation is being made regarding the particular tax consequences of the transactions contemplated by the Plan as to any creditor. Each creditor should consult with its own tax advisors regarding the consequences of the transactions contemplated by the Plan.

ARTICLE VI
MATERIAL UNCERTAINTIES AND RISK FACTORS

**HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN). THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

The following discussion is intended to be a non-exclusive summary of certain risks attendant upon consummating the Plan. You are encouraged to supplement this summary with your own analysis and evaluation of the Plan and Disclosure Statement, in their entirety, and in consultation with your own advisors. Based on the analysis of the risks summarized below, the Proponents believe that the Plan is viable and will meet all requirements of confirmation:

A.    *Parties in Interest May Object to the Classification of Claims and Interests.*

Bankruptcy Code §1122 provides that a plan may place a claim or an equity interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Proponents believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Proponents created certain Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

B.    *Failure to Satisfy Vote Requirement.*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Proponents intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Proponents may seek to accomplish an alternative chapter 11 plan. Additionally, it is possible that other parties in interest will have the right to propose an alternative plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

C.    *The Proponents May Not Be Able to Secure Confirmation of the Plan or Confirmation May Be Delayed.*

Bankruptcy Code §1129 sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtor's estate was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the solicitation procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the solicitation procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.

The Confirmation and Consummation of the Plan also are subject to certain other conditions. No assurance can be given that these conditions will be satisfied.

D.      *LSI Liquidating Trust May Object to the Amount or Classification of Claims.*

Except as otherwise provided in the Plan, the LSI Liquidating Trust reserves the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

E.      *Risk of Non-Occurrence of the Effective Date.*

Although the Proponents believe that the Effective Date will occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

F.      *Risks Affecting Potential Recoveries.*

Due to the nature of the LSI Liquidating Trust Assets, the Proponents cannot state with certainty what recovery will be available to Holders of Claims as any sale or other disposition of the LSI Liquidating Trust Assets yet to occur and recoveries on any Causes of Action are speculative. In addition, the Proponents cannot know with certainty, at this time, the number or size of Claims in Classes 3 and 4 that will ultimately be Allowed.

G.      *Risks Associated With Forward Looking Statements.*

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Proponents and their professionals relied on financial data derived from the Debtor's schedules and other filings in the Case that were available at the time of such preparation. Although the Proponents and their professionals have used their

36

reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Proponents believe that such financial information fairly reflects the financial condition of the Debtor, the Proponents and their professionals are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

ARTICLE VII
CONCLUSION

**FOR ALL OF THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE PROPONENTS BELIEVE THAT CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. THE DEBTOR URGES ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY 4:00 P.M. (Prevailing Eastern Time) ON _____.**

Respectfully submitted,

Dated: February 14, 2020
        Jericho, New York

SILVERMANACAMPORA LLP

 */s/ Anthony C. Acampora*
By: Anthony C. Acampora
100 Jericho Quadrangle
Jericho, New York 11753
Tel: (516) 479-6300
AAcampora@SilvermanAcampora.com

Dated: February 14, 2020
        New York, New York

WOLLMUTH MAHER & DEUTSCH LLP

 */s/ Brad J. Axelrod*
By: Brad J. Axelrod
500 Fifth Avenue
New York, New York 10110
Tel: (212) 382-3300
pdefilippo@wmd-law.com
baxelrod@wmd-law.com

HTRUST/2369879.1/067797